# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

NESPRESSO USA, INC., and
SOCIÉTÉ DES PRODUITS NESTLÉ S.A.

        Plaintiff/Counterclaim-Defendant,

        v.

PEET'S COFFEE, INC.,

        Defendant/Counterclaim-Plaintiff

-------------------------------------------------------------- x

Case No. 1:22-cv-02209 (CM) (RWL)

**PEET'S COFFEE, INC.'S
ANSWER, AFFIRMATIVE DEFENSES,
AND COUNTERCLAIMS**

**JURY TRIAL DEMANDED**

## ANSWER TO FIRST AMENDED COMPLAINT

Defendant and Counterclaim-Plaintiff Peet's Coffee, Inc. ("Peet's"), by and through its undersigned attorneys, for its Answer to the First Amended Complaint of Plaintiffs and Counterclaim-Defendants Nespresso USA, Inc. ("NUSA") and Société des Produits Nestlé ("SPN") (together with NUSA, "Plaintiffs"), asserts as follows:

### Nature of the Action

1.      Paragraph 1 consists of Plaintiffs' characterization of the subject matter of the current litigation for which no response is required.  To the extent that a response is required, Peet's denies the allegations in Paragraph 1, and avers that (i) its marketing and sale of single-serve espresso capsules compatible with "Nespresso"-branded machines is entirely lawful and does not create any likelihood of consumer confusion, (ii) Plaintiffs possess no "trade dress" rights in the functional and non-distinctive capsule design being asserted against Peet's in the First Amended Complaint, and (iii) Plaintiffs' belated attempt to assert such "trade dress" rights seeks to stifle competition from Peet's in the single-serve espresso capsule market.

2.      Peet's denies the allegations in Paragraph 2.

3.      Peet's denies the allegations in Paragraph 3.

4.      Peet's denies the allegations in Paragraph 4, except admits that: (i) Peet's has no corporate affiliation, connection, or association with Plaintiffs; (ii) there are espresso capsules manufactured and sold by third parties that will operate in some capacity in—that is, are compatible with—"Nespresso"-branded machines; and (iii) Peet's has properly and lawfully informed consumers that its capsules are compatible with certain of Plaintiffs' machines, including by making fair use of the word "Nespresso."

5.      Peet's denies the allegations in Paragraph 5, except admits that it has not agreed to change the shape and design of Peet's-branded single-serve espresso capsules. Peet's avers that the allegation that NUSA was "work[ing] tirelessly for nearly four years to resolve this dispute" at best misrepresents the history of communications between the parties. Prior to the filing of the original Complaint in March 2022, the last communication between Peet's and NUSA concerning the packaging and marketing of Peet's-branded espresso capsules (*e.g.*, references to "Nespresso," non-affiliation disclosures, and use of an "®" symbol) was a letter from Peet's counsel on December 21, 2018. With respect to the design of Peet's single-serve espresso capsules, outreach by NUSA or its counsel was sporadic, at best; for example, NUSA's counsel did not respond to a February 13, 2019 letter from Peet's counsel regarding the capsule design for *five months*, and there were other, months-long stretches with no communications whatsoever between the parties concerning alleged infringement.

6.      Paragraph 6 includes Plaintiffs' characterization of the claims that they are asserting and relief being sought, for which no response is required. To the extent that Paragraph 6 contains other allegations concerning Plaintiffs' beliefs about what they "welcome,"

characterizations of Peet's conduct, and purported entitlement to relief, those allegations are denied.

## The Parties

7.      Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 7.

8.      Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 8.

9.      Peet's admits the allegations in Paragraph 9.

## Jurisdiction and Venue

10.      Paragraph 10 consists of legal conclusions for which no response is required.

11.      Paragraph 11 consists of legal conclusions for which no response is required.

12.      Paragraph 12 consists of legal conclusions for which no response is required. Peet's avers that it is not contesting the Court's personal jurisdiction over Peet's.

13.      Paragraph 13 consists of legal conclusions for which no response is required, except that Peet's denies that it has "committed tortious acts." Peet's avers that it is not contesting the Court's personal jurisdiction over Peet's.

14.      Paragraph 14 consists of legal conclusions for which no response is required, except that Peet's denies that it has engaged in any "wrongful acts and conduct." Peet's avers that it is not contesting venue.

15.      Paragraph 15 consists of legal conclusions for which no response is required. Peet's avers that it is not contesting venue.

## Facts Common to All Claims for Relief[1]

### I.     Nespresso and Its Products

16.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 16, except Peet's admits that single-serve coffee/espresso products have been sold by Plaintiffs in the United States using a "Nespresso" moniker.

17.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 17, except Peet's admits that single-serve coffee/espresso products have been advertised, marketed, promoted, offered for sale, and sold by Plaintiffs in the United States using a "Nespresso" moniker.

18.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 18, except Peet's admits that there are U.S. trademark registrations for certain "Nespresso" word and design marks, and that SPN is listed as the registrant on such registrations in the United States Patent and Trademark Office ("USPTO").

### II.     Nespresso's Intellectual Property

### A.     The Original NESPRESSO Capsule Trade Dress

19.     Peet's denies the allegations in Paragraph 19, except Peet's admits that the image depicted in Paragraph 19 appears to be one angle of Plaintiffs' single-serve espresso capsule.

20.     Peet's denies the allegations in Paragraph 20, including the assertions that the described capsule design either "identif[ies] [NUSA] as the exclusive source" of such capsules or "consists of the unique combination of four distinct elements."

---

[1]     Peet's incorporates the headers and sub-headers from the First Amended Complaint solely for ease of reading, and Peet's denies that those headers and sub-headers are fair or accurate.

21.     Peet's denies the allegations in Paragraph 21, and rejects the term "Original NESPRESSO Capsule Trade Dress" as inaccurate and an incorrect legal conclusion.

22.     Peet's denies the allegations in Paragraph 22, except that Peet's lacks knowledge or information sufficient to form a belief as to the authenticity and content of the accompanying images.

23.     Peet's lacks knowledge or information sufficient to form a belief as to the nature, functionality, and "commercial impressions" of the unspecified "third-party capsules" referred to in Paragraph 23.  Peet's otherwise denies the allegations in Paragraph 23, except admits that there are third-party capsules that are available for sale in the United States market and that will operate in some capacity in Plaintiffs' espresso machines.

24.     Peet's denies the allegations in Paragraph 24, and refers to Trademark Application Serial No. 88/215,860 (the "'860 Application") for its true and accurate contents that plainly demonstrate that the alleged trade dress asserted in this case is not equivalent to the purported trade dress sought to be registered in that application.  Peet's avers that the '860 Application states that "[c]olor is not claimed as a feature of the mark," describes the "mark" as "a configuration of a dimpled coffee/espresso capsule wherein the dimple element is presented in the center bottom circle of an outward curving bottom in a conical capsule," and expressly disclaims any attempt to obtain protection of the portion of the capsule image below shown in broken or dotted lines.



25.     Peet's denies the allegations in Paragraph 25, except admits that SPN is a corporate affiliate of NUSA, and that SPN is listed as the applicant in the '860 Application.

26.     Peet's denies the allegations in Paragraph 26.

27.     Peet's denies the allegations in Paragraph 27, except that Peet's lacks knowledge or information sufficient to confirm the alleged relationship or licensing/sublicensing arrangements among SPN, NUSA, and other corporate affiliates such as Nestlé Nespresso S.A. ("NNSA").

28.     Peet's denies the allegations in Paragraph 28, except that Peet's lacks knowledge or information sufficient to confirm NUSA's responsibilities or alleged role as a "sole distributor" of "Nespresso"-branded products.  Peet's avers that in the original Complaint filed in this action, NUSA alleged that both it *and NNSA* had responsibilities with respect to advertising, marketing, and promoting "Nespresso"-branded capsules.  (*See* ECF No. 1 at ¶¶ 16, 40.)

29.     Peet's denies the allegations in Paragraph 29, except that Peet's lacks knowledge or information sufficient to confirm NUSA's responsibilities and particular activities.

30.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 30, except admits that (i) "Nespresso"-branded machines and products have been advertised in the United States and sold at retail, and (ii) NUSA and its

Nestlé affiliates have partnered with Starbucks—the "famous third-party coffee brand" to which Paragraph 30 refers—in connection with co-branded single-serve espresso capsules.

31.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 31, and avers that Peet's has no basis to assess the veracity of vague allegations concerning what takes place in "many" boutique stores and how "prominently" items or "artwork" are "feature[d]" in such stores.

32.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 32.

33.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 33, except Peet's denies that the capsules sold by NUSA consist of protectable trade dress.

34.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 34.

35.     Peet's denies the allegations in Paragraph 35, and avers that NUSA plainly is not identified by capsule shape "as the exclusive source of goods featuring [the alleged] [t]rade [d]ress" when co-branded capsules more prominently featuring the "Starbucks" branding are marketed and sold in the United States.

36.     Paragraph 36 consists of legal conclusions to which no response is required.  To the extent that Paragraph 36 includes any factual allegations, Peet's denies those allegations.

**B.     The NESPRESSO Marks**

37.     Peet's denies that Trademark Registration No. 3,813,444 encompasses goods in International Class 30, as the registration was cancelled with respect to that Class.  Peet's admits that the cited Registrations list the registrant as Société des Produits Nestlé S.A. and the

registration dates listed in the table in Paragraph 37. Peet's otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 37, and refers to the registrations and their corresponding files for their complete and accurate contents.

38.     Peet's lacks knowledge or information sufficient to form a belief as to the authenticity of the documents attached as Exhibit 1 to the First Amended Complaint and thereby lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 38 of the First Amended Complaint. Peet's refers to the registrations and their corresponding files for their complete and accurate contents.

39.     Peet's lacks knowledge or information sufficient to form a belief as to the authenticity of the documents attached as Exhibit 1 to the First Amended Complaint and thereby lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 39 of the First Amended Complaint. Peet's refers to the registrations and their corresponding files for their complete and accurate contents.[2]

40.     Paragraph 40 consists of legal conclusions for which no response is required. To the extent that Paragraph 40 includes any factual allegations, Peet's lacks knowledge or information sufficient to form a belief about the truth of such allegations, and refers to the registrations and their corresponding files for their complete and accurate contents.

---

[2]  Paragraph 39 of the original Complaint included an allegation that "this Court has recognized Nespresso's exclusive trademark rights in the NESPRESSO Marks." That allegation was removed from the First Amended Complaint, but NUSA was not granted leave to amend its pleading to do so. In an abundance of caution, Peet's denies the allegations in Paragraph 39 of the original Complaint, except admits that in the cited judicial decision, the court granted a default judgment. Peet's avers that the cited decision explained that "Defendant has failed to appear in this action and has not opposed the instant motion," and that, "[i]n light of Defendant's failure to respond to the Complaint," the factual allegations in NUSA's pleading "are deemed admitted for purposes of this motion practice." *Nespresso USA, Inc. v. Afr. Am. Coffee Trading Co. LLC D/B/A Libretto*, No. 1:15-cv-05553, 2016 U.S. Dist. LEXIS 71942, at *1, *2 n.1 (S.D.N.Y. June 2, 2016).

41.     Paragraph 41 consists of legal conclusions for which no response is required.  To the extent that Paragraph 41 includes any factual allegations, Peet's lacks knowledge or information sufficient to form a belief about the truth of such allegations, and refers to the registrations and their corresponding files for their complete and accurate contents.

42.     Paragraph 42 consists of legal conclusions for which no response is required.  To the extent that Paragraph 42 includes any factual allegations, Peet's denies that the trademarks covered by cited registrations are "conclusively valid" and avers that such an assertion does not comport with U.S. trademark law.  Peet's refers to the registrations and their corresponding files for their complete and accurate contents.

43.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 43.

44.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 44.

45.     Peet's denies the allegations in Paragraph 45, except that Peet's lacks knowledge or information sufficient to confirm NUSA's responsibilities or alleged role as a "sole distributor" of "Nespresso"-branded products.  Peet's avers that in the original Complaint filed in this action, NUSA alleged that both it *and NNSA* had responsibilities with respect to advertising, marketing, and promoting "Nespresso"-branded capsules.  (*See* ECF No. 1 at ¶¶ 16, 40.)

46.     Peet's denies the allegations in Paragraph 46, except that Peet's lacks knowledge or information sufficient to confirm NUSA's responsibilities and particular activities.

47.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 47, except admits that (i) "Nespresso"-branded machines and products have been advertised in the United States and sold at retail, and (ii) NUSA and its

Nestlé affiliates have partnered with Starbucks—the "famous third-party coffee brand" to which Paragraph 47 refers—in connection with co-branded single-serve capsules.

48.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 48.

49.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 49.

50.     Peet's denies the allegations in Paragraph 50.

51.     Paragraph 51 consists of legal conclusions to which no response is required.  To the extent that Paragraph 51 includes any factual allegations, Peet's denies those allegations.

## C.     SPN's and Nespresso's Extensive Enforcement Efforts

52.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 52, except denies that Plaintiffs have rights with respect to the capsule design incorrectly alleged to constitute protectable "trade dress."

53.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 53 concerning "vigorous[ ] enforce[ment]" of trademark rights, except denies that Plaintiffs have rights with respect to the capsule design incorrectly alleged to constitute protectable "trade dress."  Peet's avers that, to the extent that NUSA believes that it "vigorously enforce[s]" purported "rights" in the capsule design and "NESPRESSO Marks" as a matter of course, it only demonstrates that Plaintiffs' allegations concerning Peet's conduct are purely tactical and not based on genuine, imminent concerns.  By Plaintiffs' own admission (*see* ECF No. 64 ¶¶ 73-74, 87-88), they did not pursue infringement claims against Peet's for well over three years despite being consistently informed by Peet's that it had no reason or intention to change its capsule design.  Moreover, when the original Complaint was filed in March 2022,

Plaintiffs had not even broached any concerns concerning Peet's alleged misuse of "Nespresso" word marks since late 2018.

54.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 54.

55.     Peet's denies the allegations in Paragraph 55, except admits that publicly available USPTO records indicate that SPN has filed opposition proceedings in connection with "'PRESSO'-formative marks."

56.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 56, except denies that NUSA has protectable "trade dress" in a capsule design, and admits that NUSA has filed lawsuits in federal district court, including in this judicial district, asserting infringement of "Nespresso" word marks and elements of the espresso capsule design (albeit described and defined differently from the way that such alleged "trade dress" is described in the pleadings in this action).

### III.     Defendant's Unlawful Activities

57.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 57 concerning NUSA's "stores and catalogs" and "website," or about unspecified "leading third-party e-commerce websites." Peet's admits that it is aware of "Nespresso"-branded products, including single-serve espresso capsules compatible with Plaintiffs' machines.

58.     Peet's denies the allegations in Paragraph 58, except Peet's (i) lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 58 concerning Plaintiffs' purported "policing and enforcement efforts," and (ii) admits that NUSA was aware of Peet's single-serve espresso capsules before or at the time of such capsules' launch.

11

### A. Defendant's Infringing Capsule Trade Dress

59.     Peet's denies the allegations in Paragraph 59.

60.     Peet's denies the allegations in Paragraph 60, and rejects the inaccurate defined term, "Infringing Capsule." Peet's avers that the image appears to be of one angle of one of Peet's single-serve capsules that has been promoted or sold, but such image does not fully or accurately capture the design and colors of Peet's capsules. Peet's refers to its actual capsules for their full and accurate design.

61.     Peet's denies the allegations in Paragraph 61, except that Peet's lacks knowledge or information sufficient to form a belief about the authenticity and accuracy of the image on the left side of the table in Paragraph 61. Peet's avers that the image on the right side of the table appears to be of one angle of one of Peet's single-serve capsules that has been promoted or sold, but such image does not fully or accurately capture the design and colors of Peet's capsules. Peet's refers to its actual capsules for their full and accurate design.

62.     Paragraph 62 consists of legal conclusions to which no response is required. To the extent that Paragraph 62 includes any factual allegations, Peet's denies those allegations, and avers that the material differences between the capsules depicted in the images are evident, including but not limited to (1) different color schemes; (2) the large presence of the "Peet's" name and other text on the Peet's capsule; (3) differing angles of the top portions of the capsules; (4) the lack of an "inverted frustoconical indentation at the top" of the Peet's capsule; and (5) the fluting on the Peet's capsule.

63.     Paragraph 63 consists of legal conclusions to which no response is required. To the extent that Paragraph 63 includes any factual allegations, Peet's denies those allegations, and avers that the material differences between the capsules depicted in the images in Paragraph 62

12

are evident, including but not limited to (1) different color schemes; (2) the large presence of the
"Peet's" name and other text on the Peet's capsule; (3) differing angles of the top portions of the
capsules; (4) the lack of an "inverted frustoconical indentation at the top" of the Peet's capsule;
and (5) the fluting on the Peet's capsule.

  64. Paragraph 64 consists solely of NUSA's self-serving and inaccurate definition of
the design of Peet's single-serve capsules, and as such no response is required.  To the extent that
a response is required, Peet's denies the allegations in Paragraph 64.

  65. Paragraph 65 consists of legal conclusions to which no response is required.  To
the extent that Paragraph 65 includes any factual allegations, Peet's denies those allegations, and
avers that to the extent there are similarities between the capsules, such similarities concern
design elements that are functional and/or common to many compatible capsules, and thus are
not protectable as product design trade dress.

  **B. Defendant's Unlawful Uses of the NESPRESSO Marks to Launch and Garner
   Sales for Defendant's Infringing Capsule (2018-2020)**

  66. Peet's denies the allegations in Paragraph 66.

  67. Peet's denies the allegations in Paragraph 67, except admits that (i) Peet's began
selling its single-serve capsules in or around July 2018, and (ii) Peet's accurately referred to the
fact that such capsules were compatible with "Nespresso® OriginalLine" machines.  Peet's avers
that Exhibit 2 appears to be a screen capture of one sub-page of the Peet's website in or around
January 2019, but the screen capture (i) fails to capture the website fully and precisely, thus
lacking context, and (ii) uses different language from what is presented in the body of the First
Amended Complaint, and instead notes "now in capsules designed to fit your Nespresso®
Original machine*."  Peet's further avers that, in a November 8, 2018 response to NUSA's letter
of October 19, 2018 that first raised purported concerns about Peet's marketing, Peet's

volunteered (while denying any wrongdoing and to "avoid a protracted dispute") to, *inter alia*, update the disclaimer on its website to read: 'Nespresso® is a registered trademark of Société des Produits Nestlé S.A., and is not affiliated with Peet's Coffee, Inc."

68.     Peet's denies the allegations in Paragraph 68, and avers that the purported "noun" and "adjective" distinction that NUSA purports to draw has no basis—a point that was explained to NUSA in a letter from Peet's in November 8, 2018, but to which NUSA never responded or raised again until the filing of the original Complaint in this action over three years later.

69.     Peet's denies the allegations in Paragraph 69, except admits that on social media Peet's has accurately referred to its capsules as "espresso capsules."

70.     Peet's denies the allegations in Paragraph 70 and the description of Exhibit 3, except Peet's admits that it has appropriately referred to "Nespresso" by including the "®" symbol when providing lawful statements that Peet's capsules are compatible.   Peet's further avers that, in a December 21, 2018 letter to NUSA, Peet's explained that it "stands by its position that there is nothing inappropriate about its use of the '®' symbol following the Nespresso mark on its packaging and website," but that nevertheless "Peet's is willing to remove this symbol as requested by Nespresso"—as well as increase the "prominence" of disclaimer language— provided that Nespresso would provide assurances that it would not pursue legal claims against Peet's.  NUSA did not respond to the December 21, 2018 letter until *five months later*, and even then NUSA solely addressed the capsule design without mentioning Peet's marketing or packaging (or the "®" symbol).

71.     Peet's denies the allegations in Paragraph 71.

72.     Peet's denies the allegations in Paragraph 72.  Peet's avers that the purported image of a display at Target stores was included in NUSA's October 19, 2018 letter to Peet's,

but in Peet's November 8, 2018 response, Peet's explained that such configuration was not "likely to cause confusion in the first instance," but in any event "evidences a prior store configuration, which is no longer an issue, or is a configuration which has not been approved or endorsed by Peet's," and that "as of today, Target stores no longer feature Peet's [c]apsules in the appliance section of the store (the only section, as we understand, where Nespresso products are featured)." In NUSA's November 28, 2018 response, it explained that "[w]e also appreciate your representation and assurances that Target stores no longer feature Peet's products in the appliance sections and that the previous configuration was not approved or endorsed by Peet's . . . ." NUSA did not make any further mention of the placement of Peet's capsules in retail—at Target stores or otherwise—at any point between November 2018 and the filing of the original Complaint in this action March 2022.

73.    Peet's admits that counsel for NUSA sent the letter attached as Exhibit 4 to the First Amended Complaint to Peet's on or about October 19, 2018, and refers to that letter for its complete and accurate contents. Peet's avers that additional letters were exchanged between the parties on November 8, 2018 (from Peet's counsel), November 28, 2018 (from NUSA's counsel), and December 21, 2018 (from Peet's counsel)

74.    Peet's denies the allegations in Paragraph 74, except admits that it responded to NUSA's initial letter, and in connection therewith denied any infringement and did not agree to modify the design or shape of its capsules. Peet's further avers that at no point during the parties' correspondence in 2018 did NUSA point to any instances of "actual consumer confusion occurring in the marketplace."

### C.    Defendant's Ongoing Infringing of NESPRESSO's Intellectual Property (2021-Present)

75.    Peet's denies the allegations in Paragraph 75.

76.     Peet's denies the allegations in Paragraph 76, except admits that modifications have been made to Peet's packaging since launch, including moving the truthful compatibility statement to the top and increasing the prominence of the non-affiliation statement.

77.     Peet's denies the allegations in Paragraph 77.

78.     Peet's denies the allegations in Paragraph 78, except admits that modifications have been made to Peet's packaging since launch, including moving the truthful compatibility statement to the top and increasing the prominence of the non-affiliation statement.

**D.     Defendant's Actions Are Causing Actual Confusion in the Marketplace**

79.     Peet's denies the allegations in Paragraph 79, and avers that the cherry-picked customer reviews depicted in Paragraph 79 are impermissible hearsay and in all events do not demonstrate consumer confusion about whether Peet's single-serve capsules are sourced by, or affiliated, connected, or associated with NUSA or SPN.  To the contrary, the reviews demonstrate that consumers use the term "Nespresso" to refer generally to single-serve machines and capsules compatible with those machines, and NUSA's allegation that references to "Peet's Nespresso capsules" or similar language denote consumer confusion (and not merely that consumers are referring to Peet's capsules compatible with Nespresso machines) is self-serving speculation.  Indeed, Plaintiffs do not depict the myriad other customer reviews on the Peet's website that wholly undercut NUSA's theory of what these reviews actually illustrate.  For example, the following sample of reviews from Peet's website reflect that references to "Nespresso" in connection with Peet's capsules are entirely consistent that the companies are distinct and not affiliated (not to mention the scores of other reviews that explicitly compare and contrast the quality and characteristics of Peet's capsules with those of Plaintiffs' capsules):

16

★★★★★    ○ SEAN J    ⊙ San Diego                                    ⊙ a year ago

**Crema Scura is Peet's best Nespresso pod**

Better/fuller than the comparable Nespresso intensity 9 (arpeggio).

Recommends this product ⊘
                                    Yes

★★★★★    ○ MICHAEL    ⊙ Sonoma                                    ⊙ 2 years ago

**Delicious!**

So happy Peet's added decaf to their nespresso lineup! Far far far superior to Nespresso coffee!!!
More different decaf types please!!

Recommends this product ⊘
                                    Yes

Helpful?   👍 0   👎 0      Report

★★★★★    ○ ZSOFICA7O    ⊙ Portland, OR                            ⊙ 2 years ago

**Favorite Nespresso pods**

My family recently acquired an used Nespresso DeLonghi model. First we started using the original
Nespresso capsules but then we started to try out other brands.
Pete's brand is far superior all the brands! The taste for me even surpasses the original nal Nespresso
capsules!
I also love that you can order bags to send back the used capsules.
I also like their decaf pod a lot. I wish they offered more variety of decaf!

Recommends this product ⊘
                                    Yes

★★★★★   ⚲ STEPHEN   📍 Sedona, AZ                              🕐 2 years ago

**Excellent Product and Service**

I love that Peet's is making Nespresso capsules. I needed a step up from the Nespresso offerings. And while this order wasn't initially correct, their service was prompt, pleasant, and impeccable.

Recommends this product ⊘
              Yes

★★★★★   ⚲ LAROCQUE43   📍 Oakley, CA                          🕐 2 years ago

**Simply the best Nespresso Pods**

Here is the thing, and I will get it out of the way right off the bat, I love Peet's. I have a Nespresso Machine at home and an espresso machine at work. Because of this I don't have to have coffee out very often. However, if I have a chance to go to Peet's, that trumps all. Peet's is the best coffee I can get out. This pods allow me to get that same quality at home. I love the sampler pack because I get some of each strength, it give just enough variety. Each pod is great. Buy this pack, get a Nespresso, and never "have" to buy coffee at one of those other places again.

★★★★★   ⚲ HELIATTI   📍 New Mexico                            🕐 2 years ago

**best of the Nepresso cups**

We find this the best of all the Nespresso cups, any brand. Thank you, Peets!

Recommends this product ⊘
              Yes

★★★★★   ⚲ DON R   📍 Daly City                                🕐 a year ago

**Great coffee**

Real Peet's quality for your Nespresso. If you like Peet's you'll like these

Recommends this product ⊘
              Yes

★★★★★     ⚆ TPOTOOLS     ⊙ New York, NY                    ⏱ 2 years ago

**Finally! A great decaf for Nespresso**

This is the first decaf pod we've found for Nespresso that has excellent flavor. Leave it to Peet's to come up with such an excellent choice.

Recommends this product ⊘
                              Yes

★★★★★     ⚆ ANONYMOUS                                      ⏱ 3 years ago

I've had NESPRESSO machines they arrived to the USA; purchased more than a dozen for use and as many more for gifts. And although their coffee is generally pretty good, it's very rarely great. Peet's coffee pods, I can honestly say, are all great. They are as close to having an authentic expresso as is possible by using pods, so now I'm a PPC, a Peet's Pods Customer and I like the fact that they can be purchased at the stores vs having to order them on line. My only complaint is not with Peet's but with NESPRESSO itself. And that is their machines don't make the coffee hot enough. I've written many letters to them about this for years but they have done nothing to allow for upping the temperature of the extraction process. All I can do to help a tad bit is by heating my coffee mug beforehand and running a few shots of only water through the machine so that the internal mechanism isn't drawing off heat from the shot process. It helps a little but it's never sufficient to equal a freshly made espresso at Peet's, Starbucks or elsewhere. So, Peet's, why don't you up the ante and produce your own NESPRESSO machine????

★★★★★     ⚆ PSS     ⊙ Milford, MI                          ⏱ 2 years ago

**Love these pods!!**

What a difference! We only used Peet's for our drip/french press coffee making. When a quick fix was needed, we used our Nespresso maker, and their pods. Now that Peet's is making Nespresso pods-it's only Peet's for us, regardless of how the coffee is being brewed.

Recommends this product ⊘
                              Yes

★★★★★    ⚇ STUIE    ⦿ Athens, GA         ⏱ 2 years ago

**Excellent Espresso**

I was looking for a new source of Nespresso capsules and decided to order from Peet's because the capsules are aluminum. The capsules make a good, flavorful espresso and I will reorder.

Recommends this product ⦾
Yes

★★★★★    ⚇ TUFFY    ⦿ California         ⏱ 2 years ago

**Great coffee buy**

Love Peets and this variety gives me lots of nespresso options

Recommends this product ⦾
Yes

Helpful? 👍 0 👎 0    Report

★★★★★    ⚇ JCHI4    ⦿ Chicago, IL         ⏱ 2 years ago

**So good, but please make it easier to recycle!**

I think Peet's nespresso pods and the best and the strongest. SO good. I did not recieve the recycle packages that I ordered though.

Recommends this product ⦾
Yes

★★★★★    ⚇ HELIATTI    ⦿ New Mexico         ⏱ 2 years ago

**my go-to Nepresso drink!**

I am only drinking Nerissimo Espresso capsules in my Nepresso machine. Best dark flavor of any of the capsules we've tried and even better if you add a sprinkle of cardamom in the bottom of your cup.

★★★★★   👤 NJIDOC   📍 Bernardsville                      🕐 3 years ago

**Peets expresso at home!**

This has been the only coffee pods i have used since i discoverec Peets made nesspresso pods.

Recommends this product ⊘
Yes

★★★★★   👤 ALICE81   📍 Oregon                           🕐 2 years ago

**Peet's Nespresso is GREAT**

I tried for the first Peet's Espresso for Nespresso. It is fantastic! I am hooked. I tried the Ricchezza, which was the most popular. It did not disappoint !

Recommends this product ⊘
Yes

★★★★★   👤 ANONYMOUS   📍 New York, NY                    🕐 2 years ago

**Better than the "original" Nespresso Pods!**

I bought the espresso sampler (x 2 = 160 pods) for the nurses at the local hospital as a thanks for all they're doing during the COVID-19 Pandemic.
I donated my espresso machine and all the capsules I had. They all fell in love with espresso and ran out of pods quickly. Thank you PEETs for getting the shipment to us so quickly. The nurses love all 4 varieties in the Sampler and agree that the coffee is "way better" than the capsules (original Nespresso) that came with the espresso machine.

Recommends this product ⊘
Yes

★★★★★   👤 LYNNYPENNY   📍 Metro DC                       🕐 2 years ago

**Love my Peet's**

The best coffee ever
So happy they have capsules compatible with Nespresso
Better and cheaper

Recommends this product ⊘
Yes

★★★★★   AMY   ⊚ Hawaii, Hawaii      🕐 2 years ago

**I love Sumatra**

I love Sumatra and Ristretto Espresso is the closest to it in the Nesspresso Capsule form. I recommend it!!!

Recommends this product ⊘
         Yes

★★★★★   ZSOFICA70   ⊚ Portland, OR      🕐 a year ago

**Start making e.s.e. pods, too!**

Although we love the Nespresso capsule series of Peet's a lot, we hate to use any capsules. So we moved to a real espresso machine.
We still have our Nespresso machine, so we will keep using the capsules, but in smaller volume.
It would be nice if Peet's would start making e.s.e. pods for espresso machines! Our new machine can accept them, and it's a super fast way to use them when time is short.
Nevertheless, I can only suggest Peet's capsules, they taste amazing!

★★★★★   MEANUI   ⊚ Maine      🕐 2 years ago

**Fab!**

Excellent quality! Great flavor. Easy to use. Works with my Nespresso

Recommends this product ⊘
         Yes

★★★★★   JEB651   ⊚ Roseville CA      🕐 16 days ago

**What's not to like?**

I always trust Peet's Coffee. About two years ago, I saw that Peet's had Nespresso capsules. I bought a machine and that's all I use now. My wife likes the milder ones and I like the darker ones. Everybody is happy!

Recommends this product ⊘
         Yes

★★★★★   ⚲ YONNY BOY   ⦿ Northern Michigan                          🕐 6 months ago

**Perfect for Nespresso**

Works perfectly with original Nespresso. But it's Peet's!

Recommends this product ⊘
          Yes

★★★★★   ⚲ JAN   ⦿ Davis, CA                          🕐 6 months ago

**Great taste, easy to recycle**

These nespresso pods make great coffee and are easy to use. I particularly appreciate the fact that Peets facilitates recycling the pods, even using the coffee grounds for compost.

Recommends this product ⊘
          Yes

★★★★★   ⚲ SHRI   ⦿ Southampton                          🕐 2 years ago

**Great taste.**

Bought this recently and really delicious like Peet's capsules for Nespresso.

Recommends this product ⊘
          Yes

★★★★★   ⚲ MEG70   ⦿ California                          🕐 2 years ago

**Finally! Peet's decaf for Nespresso!**

I'm delighted to have my favorite Peet's coffee in a pod that works in my Nespresso machine. Now if you just had Decaf Water Process Mocha Java.....

Recommends this product ⊘
          Yes

★★★★★    ⚇ COSMO BUDIGAN    ⊚ Palo Alto, California      ⏱ 2 years ago

**Fresh coffee delivered to my front door!**

Wonderful, fresh Peet's coffee (Nespresso pods) delivered to my front door every 6 weeks. What the heck is not to love?!

Recommends this product ⊘
Yes

★★★★★    ⚇ QUEENBEAN    ⊚ Austin, TX      ⏱ 2 years ago

**Love**

Love my Peet's all the time and especially in my Nespresso. So good!

Recommends this product ⊘
Yes

★★★★★    ⚇ HANNN    ⊚ Seattle      ⏱ 2 years ago

**Always my favorite part of my morning**

I usually buy from Peet's in person but I bought these for the first time online. They came in faster than I was expecting, and were exactly the same quality. There is no better espresso pod for the Nespresso, I've tried a lot, and Peet's can't be beat.

Reviews for other companies' capsules compatible with Nespresso-branded machines also reflect the same general usage of the word "Nespresso"—*e.g.*, reviews of the Starbucks/Nespresso co-branded capsules:

★★★★★ ShellyB1202 · 4 years ago
**The BEST Nespresso capsules I have tred yet!**

After trying these for the first time, they immediately
became my favorite Nespresso capsules. They're
extremely good, the best that I have had so far. I've
tried nearly all of the Nespresso line capsules and
also all of the Peet's Nespresso capsules, which are
both exceptionally delicious, but these Starbucks
Nespresso capsules have blown the other brands out
of the water for me. This Espresso blend is a full
bodied, strong, dark blend that is perfectly done - no
burnt or acidic taste to it at all. It comes out thick and
creamy and you get lots of delicious crema on top of
your beverage. The aluminum cups are well made
and performed perfectly. Is it *exactly* like the
Starbucks flavor that you'll get at your local
Starbucks shop? No, not in my opinion, but it's very
close and definitely worth a try. I look forward to
trying the other blends.

80.    Peet's denies the allegations in Paragraph 80, and avers that the cherry-picked
(and hearsay) customer reviews on Amazon.com depicted in Paragraph 80 in all events do not
demonstrate consumer confusion about whether Peet's single-serve capsules are sourced by, or
affiliated, connected, or associated with NUSA or SPN (*see supra* ¶ 79).

81.    Peet's denies the allegations in Paragraph 81, and avers that the cherry-picked
(and hearsay) Facebook comments depicted in Paragraph 81 in all events do not demonstrate
consumer confusion about whether Peet's single-serve capsules are sourced by, or affiliated,
connected, or associated with NUSA or SPN (*see supra* ¶ 79).

82.    Peet's denies the allegations in Paragraph 82, and avers that the cherry-picked
(and hearsay) Facebook comment and response depicted in Paragraph 82 in all events does not
demonstrate consumer confusion about whether Peet's single-serve capsules are sourced by, or
affiliated, connected, or associated with NUSA or SPN (*see supra* ¶ 79).  To the contrary, the
Facebook comment reflects that the commenter appreciated that Peet's was making capsules

25

compatible with Nespresso machines ("the Nespresso capsules"), and the response makes no mention of "Nespresso" whatsoever, referring to the pods as "our espresso capsule offering."

83.     Peet's denies the allegations in Paragraph 83, and avers that the cherry-picked (and hearsay) Facebook comment and response depicted in Paragraph 83 in all events does not demonstrate consumer confusion about whether Peet's single-serve capsules are sourced by, or affiliated, connected, or associated with NUSA or SPN (*see supra* ¶ 79).  To the contrary, the Facebook comment reflects a question as to whether Peet's will be coming out with newer pods compatible with Nespresso machines (presumably referring to Nespresso's "Vertuo" line), and the response makes no mention of "Nespresso" whatsoever, referring to the pods as "new Espresso Capsules."

84.     Peet's denies the allegations in Paragraph 84, and avers that the cherry-picked (and hearsay) Twitter post depicted in Paragraph 84 in all events does not demonstrate consumer confusion about whether Peet's single-serve capsules are sourced by, or affiliated, connected, or associated with NUSA or SPN (*see supra* ¶ 79).

85.     Peet's denies the allegations in Paragraph 85, and avers that the cherry-picked (and hearsay) Twitter exchange depicted in Paragraph 85 in all events does not demonstrate consumer confusion about whether Peet's single-serve capsules are sourced by, or affiliated, connected, or associated with NUSA or SPN (*see supra* ¶ 79).  To the contrary, the exchange demonstrates that consumers use the term "Nespresso" to refer generically to capsules compatible with Nespresso-branded espresso machines, and Peet's response makes no mention of "Nespresso" whatsoever, referring to the pods as "[o]ur Espresso Capsules."

86.     Peet's denies the allegations in Paragraph 86, and avers that the cherry-picked (and hearsay) Twitter post depicted in Paragraph 86 in all events does not demonstrate consumer

confusion about whether Peet's single-serve capsules are sourced by, or affiliated, connected, or associated with NUSA or SPN (*see supra* ¶ 79).  Indeed, NUSA's allegation that this Twitter post reflects consumer confusion makes no sense because (1) to the best of Peet's knowledge, Plaintiffs have never sold a "Crema Scura"-named espresso pod, and "Crema Scura" is a product uniquely identified with Peet's, and (2) the Twitter post, which is directed to "@peetscoffee," inquires as to "what whole bean product *of yours* is most similar to the Crema Scura pods" (emphasis added).

87.      Peet's denies the allegations in Paragraph 87.  Peet's avers that if Plaintiffs truly believed that Peet's actions were "brazen" and that Plaintiffs have been given "no choice but to bring this action to protect its most valuable assets," Plaintiffs would not have dithered for well over three years before pursuing legal action.  Peet's further avers that if there truly was "widespread actual consumer confusion," Plaintiffs could point to something other than hearsay that, in all events, is at best ambiguous (*see supra* ¶ 79).

88.      Peet's denies the allegations in Paragraph 88, except admits that Peet's (i) has not agreed to change the shape and design of Peet's-branded single-serve espresso capsules, and (ii) filed an Opposition to the '860 Application because Peet's believes in good faith that the alleged trade dress that is the subject of the '860 Application (different from the alleged trade dress asserted by in this case) is not protectable.  Peet's avers that the allegation that Plaintiffs "worked feverishly for years to attempt to resolve this dispute" is a mischaracterization of the history of communications between Peet's and NUSA.

89.      The allegations in Paragraph 89 include Plaintiffs' characterization of the claims that they are asserting and relief that they are seeking, for which no response is required.  To the extent that Paragraph 89 contains factual allegations, Peet's denies those allegations.

## CLAIMS FOR RELIEF

### COUNT I
*(Federal Trademark Infringement Under 15 U.S.C. § 1114(1))*
*(Infringement of the NESPRESSO Marks)*

90.     Peet's refers to and incorporates by reference its responses to Paragraphs 1-89 as though fully set forth herein.

91.     Paragraph 91 merely consists of Plaintiffs' characterization of Count I for which no response is necessary.

92.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 92.

93.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 93.

94.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 94.

95.     Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 95.

96.     Peet's denies the allegations in Paragraph 96.

97.     Peet's denies the allegations in Paragraph 97.

98.     Peet's denies the allegations in Paragraph 98, except admits that Peet's single-serve capsules are marketed and sold in a manner that lawfully refers to compatibility with certain "Nespresso" machines.

99.     Peet's denies the allegations in Paragraph 99.

100.    Peet's denies the allegations in Paragraph 100, except admits that both Peet's and Plaintiffs' single-serve capsules contain espresso.

101.    Peet's denies the allegations in Paragraph 101, except admits that both Peet's and Plaintiffs' single-serve capsules are sold to espresso drinkers.

102.    Peet's denies the allegations in Paragraph 102, and avers that Plaintiffs do not sell their OriginalLine capsules in most of the sales channels where Peet's compatible capsules are sold, such as various retail locations and grocery stores that are not Plaintiffs' boutiques.

103.    Peet's denies the allegations in Paragraph 103.

104.    Peet's denies the allegations in Paragraph 104.

105.    Peet's denies the allegations in Paragraph 105, except admits that in or about July 2018, Peet's single-serve capsule packaging accurately referred to the fact that such capsules were compatible with "Nespresso" OriginalLine machines, and included a non-affiliation statement referring to SPN.

106.    Peet's denies the allegations in Paragraph 106, except admits that in or about July 2018, the front of Peet's single-serve capsule packaging accurately referred to the fact that such capsules were compatible with "Nespresso" OriginalLine machines, and included a non-affiliation statement referring to SPN.

107.    Peet's denies the allegations in Paragraph 107, except admits that modifications have been made to Peet's packaging since launch.

108.    Peet's denies the allegations in Paragraph 108, except admits that modifications have been made to Peet's packaging since launch.

109.    Peet's denies the allegations in Paragraph 109, except admits that in or about July 2018, Peet's website accurately referred to the fact that such capsules were compatible with "Nespresso" OriginalLine machines, and included a non-affiliation statement.

Case 1:22-cv-02209-CM-RWL   Document 84   Filed 02/24/23   Page 30 of 80

110.    Peet's denies the allegations in Paragraph 110, except admits that its website has accurately referred to the fact that capsules are compatible with "Nespresso" OriginalLine machines, includes a non-affiliation statement, and includes the "®" symbol.

111.    Peet's denies the allegations in Paragraph 111.  Peet's avers that Plaintiffs herein concede that Peet's is using the "Nespresso" name in a "descriptive" way.

112.    Peet's denies the allegations in Paragraph 112.

113.    Peet's denies the allegations in Paragraph 113, which are redundant of the allegations in Paragraph 112.

114.    Peet's denies the allegations in Paragraph 114, except admits that Plaintiffs have not purported to "consent" to Peet's lawful references to "Nespresso" in connection with compatible capsules.

115.    Peet's denies the allegations in Paragraph 115.

116.    Peet's denies the allegations in Paragraph 116.

117.    Peet's denies the allegations in Paragraph 117.

118.    Peet's denies the allegations in Paragraph 118.

119.    Peet's denies the allegations in Paragraph 119.

120.    Peet's denies the allegations in Paragraph 120.

## COUNT II
*(Federal Trade-Dress Infringement Under 15 U.S.C. § 1125(a))*
*(Infringement of the Original NESPRESSO Capsule Trade Dress)*

121.    Peet's refers to and incorporates by reference its responses to Paragraphs 1-120 as though fully set forth herein.

122.    Paragraph 122 merely consists of Plaintiffs' characterization of Count II for which no response is necessary.

123.   Peet's denies the allegations in Paragraph 123, except admits that SPN is listed as the applicant in the '860 Application.

124.   Peet's denies the allegations in Paragraph 124.

125.   Peet's denies the allegations in Paragraph 125.

126.   Peet's denies the allegations in Paragraph 126.

127.   Peet's denies the allegations in Paragraph 127.

128.   Peet's denies the allegations in Paragraph 128.

129.   Peet's denies the allegations in Paragraph 129.

130.   Paragraph 130 constitutes a legal conclusion for which no response is necessary. To the extent a response is necessary, Peet's denies the allegations in Paragraph 130.

131.   Peet's denies the allegations in Paragraph 131.

132.   Peet's denies the allegations in Paragraph 132, except admits that both Peet's and Plaintiffs' single-serve capsules contain espresso.

133.   Peet's denies the allegations in Paragraph 133, except admits that both Peet's and Plaintiffs' single-serve capsules are sold to espresso drinkers.

134.   Peet's denies the allegations in Paragraph 134, and avers that Plaintiffs do not sell their OriginalLine capsules in most of the sales channels where Peet's compatible capsules are sold, such as various retail locations and grocery stores that are not Plaintiffs' boutiques.

135.   Peet's denies the allegations in Paragraph 135.

136.   Peet's denies the allegations in Paragraph 136.

137.   Peet's denies the allegations in Paragraph 137.

138.   Peet's denies the allegations in Paragraph 138, except admits that Peet's has not agreed to modify the design of its single-serve capsules.

139.    Peet's denies the allegations in Paragraph 139, except admits that Plaintiffs have

not purported to "consent" to Peet's lawful use of its capsule shape.

140.    Peet's denies the allegations in Paragraph 140.

141.    Peet's denies the allegations in Paragraph 141.

142.    Peet's denies the allegations in Paragraph 142.

143.    Peet's denies the allegations in Paragraph 143.

144.    Peet's denies the allegations in Paragraph 144.

145.    Peet's denies the allegations in Paragraph 145.

## COUNT III
*(Federal Unfair Competition, False Endorsement, False Association, and False Designation of Origin Under 15 U.S.C. § 1125(a))*
*(Use of the NESPRESSO Marks)*

146.    Peet's refers to and incorporates by reference its responses to Paragraphs 1-145 as

though fully set forth herein.

147.    Paragraph 147 merely consists of Plaintiffs' characterization of Count III for

which no response is necessary.

148.    Peet's lacks knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 148.

149.    Peet's lacks knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 149.

150.    Peet's lacks knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 150.

151.    Peet's lacks knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 151.

152.    Peet's denies the allegations in Paragraph 152.

153.    Peet's denies the allegations in Paragraph 153.

154.    Peet's denies the allegations in Paragraph 154, except admits that Peet's single-serve capsules are marketed and sold in a manner that lawfully refers to compatibility with certain "Nespresso" machines.

155.    Peet's denies the allegations in Paragraph 155.

156.    Peet's denies the allegations in Paragraph 156, except admits that both Peet's and Plaintiffs' single-serve capsules contain espresso.

157.    Peet's denies the allegations in Paragraph 157, except admits that both Peet's and Plaintiffs' single-serve capsules are sold to espresso drinkers.

158.    Peet's denies the allegations in Paragraph 158, and avers that Plaintiffs do not sell their OriginalLine capsules in most of the sales channels where Peet's compatible capsules are sold, such as various retail locations and grocery stores that are not Plaintiffs' boutiques.

159.    Peet's denies the allegations in Paragraph 159.

160.    Peet's denies the allegations in Paragraph 160.

161.    Peet's denies the allegations in Paragraph 161.

162.    Peet's denies the allegations in Paragraph 162, except admits that in or about July 2018, Peet's single-serve capsule packaging accurately referred to the fact that such capsules were compatible with "Nespresso" OriginalLine machines, and included a non-affiliation statement referring to SPN.

163.    Peet's denies the allegations in Paragraph 163, except admits that in or about July 2018, the front of Peet's single-serve capsule packaging accurately referred to the fact that such capsules were compatible with "Nespresso" OriginalLine machines, and included a non-affiliation statement referring to SPN.

164.    Peet's denies the allegations in Paragraph 164, except admits that modifications have been made to Peet's packaging since launch.

165.    Peet's denies the allegations in Paragraph 165, except admits that modifications have been made to Peet's packaging since launch.

166.    Peet's denies the allegations in Paragraph 166, except admits that in or about July 2018, Peet's website accurately referred to the fact that such capsules were compatible with "Nespresso" OriginalLine machines, and included a non-affiliation statement.

167.    Peet's denies the allegations in Paragraph 167, except admits that its website has accurately referred to the fact that capsules are compatible with "Nespresso" OriginalLine machines, includes a non-affiliation statement, and includes the "®" symbol.

168.    Peet's denies the allegations in Paragraph 168.  Peet's avers that Plaintiffs herein concede that Peet's is using the "Nespresso" name in a "descriptive" way.

169.    Peet's denies the allegations in Paragraph 169.

170.    Peet's denies the allegations in Paragraph 170, except admits that SPN has not purported to "consent" to Peet's lawful references to "Nespresso" in connection with compatible capsules.

171.    Peet's denies the allegations in Paragraph 171, except admits that NUSA has not purported to "consent" to Peet's lawful references to "Nespresso" in connection with compatible capsules.

172.    Peet's denies the allegations in Paragraph 172.

173.    Peet's denies the allegations in Paragraph 173.

174.    Peet's denies the allegations in Paragraph 174.

175.    Peet's denies the allegations in Paragraph 175.

176.    Peet's denies the allegations in Paragraph 176.

177.    Peet's denies the allegations in Paragraph 177.

## COUNT IV
*(Federal Unfair Competition, False Endorsement, False Association, and False Designation of Origin Under 15 U.S.C. § 1125(a))*
*(Use of Defendant's Infringing Capsule Trade Dress)*

178.    Peet's refers to and incorporates by reference its responses to Paragraphs 1-177 as though fully set forth herein.

179.    Paragraph 179 merely consists of Plaintiffs' characterization of Count IV for which no response is necessary.

180.    Peet's denies the allegations in Paragraph 180.

181.    Peet's denies the allegations in Paragraph 181.

182.    Peet's denies the allegations in Paragraph 182.

183.    Peet's denies the allegations in Paragraph 183.

184.    Peet's denies the allegations in Paragraph 184.

185.    Peet's denies the allegations in Paragraph 185.

186.    Peet's denies the allegations in Paragraph 186.

187.    Paragraph 187 constitutes a legal conclusion for which no response is necessary. To the extent a response is necessary, Peet's denies the allegations in Paragraph 187.

188.    Peet's denies the allegations in Paragraph 188.

189.    Peet's denies the allegations in Paragraph 189, except admits that both Peet's and Plaintiffs' single-serve capsules compatible with OriginalLine machines contain espresso.

190.    Peet's denies the allegations in Paragraph 190, except admits that both Peet's and Plaintiffs' single-serve capsules compatible with OriginalLine machines are sold to espresso drinkers.

191.   Peet's denies the allegations in Paragraph 191, and avers that Plaintiffs do not sell their OriginalLine capsules in most of the sales channels where Peet's compatible capsules are sold, such as various retail locations and grocery stores that are not Plaintiffs' boutiques.

192.   Peet's denies the allegations in Paragraph 192.

193.   Peet's denies the allegations in Paragraph 193.

194.   Peet's denies the allegations in Paragraph 194.

195.   Peet's denies the allegations in Paragraph 195, except admits that Peet's has not agreed to modify the design of its single-serve espresso capsules.

196.   Peet's denies the allegations in Paragraph 196, except admits that SPN has not purported to "consent" to Peet's lawful use of its capsule shape.

197.   Peet's denies the allegations in Paragraph 197, except admits that NUSA has not purported to "consent" to Peet's lawful use of its capsule shape.

198.   Peet's denies the allegations in Paragraph 198.

199.   Peet's denies the allegations in Paragraph 199.

200.   Peet's denies the allegations in Paragraph 200.

201.   Peet's denies the allegations in Paragraph 201.

202.   Peet's denies the allegations in Paragraph 202.

203.   Peet's denies the allegations in Paragraph 203.

## COUNT V
### *(Unfair Competition and Passing Off Under New York Common Law)*
### *(Use of the NESPRESSO Marks)*

204.   Peet's refers to and incorporates by reference its responses to Paragraphs 1-203 as though fully set forth herein.

205.   Paragraph 205 merely consists of Plaintiffs' characterization of Count V for which no response is necessary.

206.    Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 206.

207.    Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 207.

208.    Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 208.

209.    Peet's lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 209.

210.    Peet's denies the allegations in Paragraph 210.

211.    Peet's denies the allegations in Paragraph 211.

212.    Peet's denies the allegations in Paragraph 212, except admits that Peet's single-serve capsules are marketed and sold in a manner that lawfully refers to compatibility with certain "Nespresso" machines.

213.    Peet's denies the allegations in Paragraph 213.

214.    Peet's denies the allegations in Paragraph 214, except admits that both Peet's and Plaintiffs' single-serve capsules compatible with OriginalLine machines contain espresso.

215.    Peet's denies the allegations in Paragraph 215, except admits that both Peet's and Plaintiffs' single-serve capsules compatible with OriginalLine machines are sold to espresso drinkers.

216.    Peet's denies the allegations in Paragraph 216, and avers that Plaintiffs do not sell their OriginalLine capsules in most of the sales channels where Peet's compatible capsules are sold, such as various retail locations and grocery stores that are not Plaintiffs' boutiques.

217.    Peet's denies the allegations in Paragraph 217.

218.    Peet's denies the allegations in Paragraph 218.

219.    Peet's denies the allegations in Paragraph 219.

220.    Peet's denies the allegations in Paragraph 220, except admits that SPN has not purported to "consent" to Peet's lawful references to "Nespresso" in connection with compatible capsules.

221.    Peet's denies the allegations in Paragraph 221, except admits that NUSA has not purported to "consent" to Peet's lawful references to "Nespresso" in connection with compatible capsules.

222.    Peet's denies the allegations in Paragraph 222.

223.    Peet's denies the allegations in Paragraph 223.

224.    Peet's denies the allegations in Paragraph 224.

225.    Peet's denies the allegations in Paragraph 225.

226.    Peet's denies the allegations in Paragraph 226.

227.    Peet's denies the allegations in Paragraph 227.

## COUNT VI
*(Unfair Competition and Passing Off Under New York Common Law)*
*(Use of Defendant's Infringing Capsule Trade Dress)*

228.    Peet's refers to and incorporates by reference its responses to Paragraphs 1-227 as though fully set forth herein.

229.    Paragraph 229 merely consists of Plaintiffs' characterization of Count VI for which no response is necessary.

230.    Peet's denies the allegations in Paragraph 230.

231.    Peet's denies the allegations in Paragraph 231.

232.    Peet's denies the allegations in Paragraph 232.

233.    Peet's denies the allegations in Paragraph 233.

234.    Peet's denies the allegations in Paragraph 234.

235.    Peet's denies the allegations in Paragraph 235.

236.    Peet's denies the allegations in Paragraph 236.

237.    Peet's denies the allegations in Paragraph 237.

238.    Peet's denies the allegations in Paragraph 238, except admits that both Peet's and Plaintiffs' single-serve capsules compatible with OriginalLine machines contain espresso.

239.    Peet's denies the allegations in Paragraph 239, except admits that both Peet's and Plaintiffs' single-serve capsules compatible with OriginalLine machines are sold to espresso drinkers.

240.    Peet's denies the allegations in Paragraph 240, and avers that Plaintiffs do not sell their OriginalLine capsules in most of the sales channels where Peet's compatible capsules are sold, such as various retail locations and grocery stores that are not Plaintiffs' boutiques.

241.    Peet's denies the allegations in Paragraph 241.

242.    Peet's denies the allegations in Paragraph 242.

243.    Peet's denies the allegations in Paragraph 243.

244.    Peet's denies the allegations in Paragraph 244, except admits that Peet's has not agreed to modify the design of its single-serve espresso capsules.

245.    Peet's denies the allegations in Paragraph 245, except admits that SPN has not purported to "consent" to Peet's lawful use of its capsule shape.

246.    Peet's denies the allegations in Paragraph 246, except admits that NUSA has not purported to "consent" to Peet's lawful use of its capsule shape.

247.    Peet's denies the allegations in Paragraph 247.

248.    Peet's denies the allegations in Paragraph 248.

249.   Peet's denies the allegations in Paragraph 249.

250.   Peet's denies the allegations in Paragraph 250.

251.   Peet's denies the allegations in Paragraph 251.

252.   Peet's denies the allegations in Paragraph 252.

### Prayer for Relief

Peet's denies that Plaintiffs are entitled to any of the relief sought by Plaintiffs in the First Amended Complaint, and notes that the relief sought further betrays Plaintiffs' plainly anti-competitive purpose in bringing the instant lawsuit.  For example, the very first relief requested is that Peet's be enjoined from any use of "NESPRESSO Marks" "on and/or in connection with the manufacture, distribution, advertising, marketing, promoting, offering for sale, and/or sale of any goods or services."  In other words, Plaintiffs hope to preclude Peet's from lawfully (and in compliance with fundamental principles of fair use) marketing its products as compatible with "Nespresso"-branded machines.

### Jury Demand

No response to the jury demand is necessary.

### AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiffs' claims are barred in whole or in part because they possess no valid and protectable intellectual property rights to enforce against Peet's, including but not limited to the fact that Plaintiffs cannot carry their burden to demonstrate protectable trade dress.

### Second Affirmative Defense

Plaintiffs' claims are barred in whole or in part because the alleged trademarks that they seek to enforce are generic.

### Third Affirmative Defense

Plaintiffs' claims are barred in whole or in part because the alleged trademarks that they seek to enforce are descriptive, but Plaintiffs cannot demonstrate secondary meaning.

### Fourth Affirmative Defense

Plaintiffs' claims are barred in whole or in part because Peet's alleged uses of Plaintiffs' purported intellectual property is protected by well-established doctrines of fair use.

### Fifth Affirmative Defense

Plaintiffs' claims are barred in whole or in part by the doctrines of laches, acquiescence, waiver, and estoppel.

### Sixth Affirmative Defense

Plaintiffs' claims are barred in whole or in part by the doctrine of unclean hands.

### Seventh Affirmative Defense

Plaintiffs' claims are barred in whole or in part by the doctrine of trademark misuse.

## COUNTERCLAIMS

Defendant and Counterclaim-Plaintiff Peet's Coffee, Inc. ("Peet's"), by and through its undersigned attorneys, for its Counterclaims against Plaintiffs and Counterclaim-Defendants Nespresso USA, Inc. ("NUSA") and Société des Produits Nestlé ("SPN") (together, "Counterclaim-Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      This action concerns Counterclaim-Defendants' attempt to suppress Peet's ability to compete in the single-serve espresso capsule market.

2.      Seeking to preserve their dominant market share despite the expiration of patents that had prevented competitors from selling capsules compatible with the "OriginalLine" espresso system, Counterclaim-Defendants now levels meritless accusations of "willful" trade dress and trademark infringement against Peet's.

3.      Tellingly, however, Counterclaim-Defendants are unable to identify any actual consumer confusion in the nearly five years that Peet's has been selling its capsules, and are well aware that they possess no protectable trade dress in the previously patented OriginalLine capsules.

4.      Indeed, Counterclaim-Defendants' allegations cannot be squared with the plain facts regarding their past conduct and the capsules at issue—all of which point to the filing of a strategic lawsuit intended to chill competition from Peet's rather than address a genuine concern about public deception or unfair competition.

5.      For example, and as detailed in these Counterclaims:

- Counterclaim-Defendants have long identified a host of reasons why compatible capsules have been successful—including recognizing Counterclaim-Defendants' own deficiencies—and none of those reasons was that consumers were confused or deceived by Peet's (or other companies') products;

42

- Numerous recent proceedings have rejected and invalidated trade dress and design protections for the OriginalLine capsule, finding that the capsule's shape is functional and specially designed to work in Counterclaim-Defendants' machines;

- Counterclaim-Defendants' articulations of the supposed capsule trade dress have been wildly inconsistent for years, reflecting an effort to reverse engineer a viable enforcement theory; and

- Counterclaim-Defendants waited over three years to file a lawsuit against Peet's, and only did so when Peet's filed an Opposition to SPN's federal trade dress application and discovery in that proceeding was commencing—hardly the actions of parties who believe that there is material consumer confusion causing imminent and irreparable harm in the marketplace.

6.      Counterclaim-Defendants also have asserted infringement claims based on the use of "Nespresso" trademarks in Peet's accurate statements that its capsules are compatible with the OriginalLine machines, but these claims are nothing more than attempts to gain additional leverage in litigation.

7.      In that regard, Counterclaim-Defendants rely only on purported conduct from years ago, and allege concerns that have not been so much as mentioned to Peet's since 2018—again, hardly the actions of parties that truly believe they are being injured and consumers are being deceived.

8.      Counterclaim-Defendants' anti-competitive bent is further revealed by the sweeping relief that they seek in this lawsuit, which is designed to preclude Peet's from (i) accurately describing the compatibility of its capsules to consumers, and (ii) otherwise fairly competing in the marketplace.  For example, in their Prayer for Relief, Counterclaim-Defendants demand an injunction preventing Peet's from "using the NESPRESSO Marks" in any capacity whatsoever "on and/or in connection with the manufacture, distribution, advertising, marketing, promoting, offering for sale, and/or sale of any goods or services[.]"

43

9.      Counterclaim-Defendants' efforts to stifle a lawful competitor must be rejected, including because Counterclaim-Defendants do not have any intellectual property rights to enforce.

10.     Counterclaim-Defendants cannot carry their burden to demonstrate that the purported capsule design trade dress is distinctive and nonfunctional.  Moreover, as their own purported "confusion" evidence set forth in the First Amended Complaint demonstrates, and through no fault of Peet's, the word "Nespresso" has come to generically refer to single-serve espresso capsules.

11.     Peet's thus is entitled to declarations that Counterclaim-Defendants do not have any enforceable intellectual property rights in the trade dress and trademarks that have been asserted against Peet's.

**THE PARTIES**

12.     Counterclaim-Plaintiff Peet's Coffee, Inc. ("Peet's") is a Virginia corporation, with a principal place of business at 1400 Park Avenue, Emeryville, California 94608.

13.     Counterclaim-Defendant Nespresso USA, Inc. ("NUSA") is a Delaware corporation, with a principal place of business at 111 West 33rd Street, 5th Floor, New York, New York 10120.

14.     Counterclaim-Defendant Société des Produits Nestlé S.A. ("SPN") is a corporation organized under the laws of Switzerland, with a principal place of business at Avenue Nestlé 55, 1800 Vevey, Switzerland.

15.     NUSA and SPN are corporate affiliates of each other, and are both wholly-owned subsidiaries of Nestlé S.A., a company organized under the laws of Switzerland.

16. On information and belief, SPN is a direct wholly-owned subsidiary of Nestlé S.A., and NUSA is an indirect wholly-owned subsidiary of Nestlé S.A.

17. On information and belief, NUSA is a wholly-owned, indirect subsidiary of SPN. As stated in NUSA's Rule 7.1 Corporate Disclosure Statement filed in February 2022 in *K-fee System GmbH v. Nespresso USA, Inc.*, No. 2:22-cv-00525 (C.D. Cal. 2022), at ECF No. 21: NUSA is wholly owned by Nestlé Holdings, Inc, which is in turn wholly owned by NIMCO US, Inc., which is in turn wholly owned by Nestlé US Holdco, Inc., which is in turn wholly owned by SPN.

18. Although not a named party, Nestlé Nespresso S.A. ("NNSA"), a Swiss affiliate of SPN and NUSA that is an indirect wholly-owned subsidiary of Nestlé S.A., also plays an important role in the conduct at issue in the current litigation.

19. Upon information and belief, NNSA is responsible for the manufacturing of all of Counterclaim-Defendants' capsules for OriginalLine machines.

20. Although technically separate corporate entities, NUSA's and NNSA's operations are closely intertwined, and they regularly coordinate on matters pertaining to the marketing and sale of espresso systems and capsules in the United States. For example:

- Per sworn declarations from NUSA and NNSA filed in the *K-fee* litigation, NNSA is responsible for administrative, management, and support services, sales, marketing, and distribution of "Nespresso"-branded beverage systems and capsules, and NUSA is an exclusive distributor that "reports" to NNSA.

- Both NUSA and NNSA have been involved (and invested in) advertising, marketing, and selling espresso systems and "capsules that are compatible with its machines . . . throughout the world, including the United States," (ECF No. 1 at ¶¶ 16, 40.)

- Corporate executives routinely have participated in and supervised strategy development with respect to addressing the U.S. compatible capsule market, during their tenures at both NUSA and NNSA.

- The U.S.-targeted "Nespresso" website, www.nespresso.com, lists NNSA's name in the bottom right corner (currently, "Nestlé Nespresso S.A. 2023"), indicating that it is responsible for that website's content.

21.     Documents already produced by NUSA in this litigation further demonstrate how closely aligned NUSA and NNSA are on U.S. capsule strategy.  For example, NUSA personnel regularly ████████████████████████████████ and communicate with NNSA about ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████.

22.     NNSA also appears to be a critical link in the chain of purported intellectual property rights at issue in this litigation.  Per NUSA's original Complaint, the alleged trademark and trade dress rights are exclusively licensed by SPN to NNSA, which in turn sublicenses those rights to NUSA.  (*See* ECF No. 1 at ¶¶ 22, 31, 37-38.)

23.     Finally, Counterclaim-Defendants have represented to Peet's that NNSA—not NUSA or SPN—possesses certain categories of documents critical to this matter, including materials concerning the design, development, and manufacturing of those capsules that are critical to the parties' positions regarding the functionality of the capsule design.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over the Counterclaims pursuant to 28 U.S.C. §§ 1331, 2201 and 2202.

25.     This Court has personal jurisdiction over NUSA and SPN because, *inter alia*, both NUSA and SPN have purposefully availed themselves of the benefits of this forum by filing their First Amended Complaint here.

26.     Pursuant to 28 U.S.C. § 1391(b)(3), venue is proper in this judicial district because Counterclaim-Defendants are subject to personal jurisdiction in this judicial district, and because Counterclaim-Defendants have chosen this venue for the current litigation, without any objection from Peet's.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

I.     **The Rise of the Patented "Nespresso" Home Espresso System and Capsules**

27.     In or about 1975, an engineer working for Nestlé in Switzerland named Eric Favre invented the first prototype espresso machine and a sealed capsule that was a predecessor for what subsequently became the "Nespresso"-branded single-serve espresso capsules, or "pods"— now referred to by Counterclaim-Defendants as the "OriginalLine" capsules and system.

28.     Nestlé filed its first patent for a single-serve coffee system in 1976, and began selling aluminum "Nespresso"-branded capsules on the market about a decade later.

29.     Over time, the espresso system became very successful, particularly after Nestlé changed its marketing strategy by both (i) targeting the espresso system to individual consumers as a luxury and premium product instead of focusing on business-to-business sales, and (ii) focusing the business on the value to be gained from the capsules rather than the machines.

30.     As part of that change in strategy, the price of "Nespresso"-branded single-serve espresso capsules was substantially increased in support of the premium positioning.

31.     Nestlé, including then-executive Jean-Paul Gaillard, understood that there was more money to be made in the capsules than in the espresso machines themselves; in other words, that "Nespresso" was better positioned as a *coffee* brand rather than a coffee *machine* brand.  Accordingly, entry-level machines were sold at lower prices, with the understanding that

customers would be a captive audience, locked in when it came to purchasing capsules that would work only in "Nespresso"-branded machines.

32.     Key to the "Nespresso" system's success, therefore, was the monopoly created by patents on that system and on the capsules that worked in those systems. For many years, those patents prevented competitors from marketing and selling their own capsules that would be compatible with the system, depriving consumers of the ability to explore alternatives.

33.     The patent regime protecting against entry into the OriginalLine system and capsules was robust. Indeed, by the early 2010s, it was reported that the "Nespresso" system was subject to over 1,700 patents, and Richard Girardot, then-President of NNSA, trumpeted the "more than 1,700 patents" in a June 2010 presentation to investors.[3]

34.     Patents protecting the capsule design were critical. For example, a 1979 patent for a "capsule for beverage preparation," U.S. Patent No. 4,136,202 (the "'202 Patent"), described functional benefits of the "truncated cone" shape and a "domed end having a recess for receiving [a] water-injection piercing member," including increased resistance to crushing:



---

[3]    Richard Girardot, *The* Nespresso *Winning Formula: Continuous Innovation and Highest Quality as Cornerstones for Sustainable Growth*, Nestlé (June 21, 2010), https://www.nestle.com/sites/default/files/asset-library/documents/library /presentations/investors_events/investors-seminar-2010/nestl%C3%A9-nespresso-jun2010-girardot.pdf.

35.     Other subsequently granted patents also speak to the functions of various aspects

of the capsules.  For example, U.S. Patent No. 9,162,815, based on an application filed in 2010,

concerns a "capsule for the preparation of a coffee extract having a structure facilitating

perforation for injection of water," and describes a capsule with a "frusto-conical body with a

rim, sidewall, and an inlet wall" that may have "a flat or convex portion and a structure in relief

or in recess arranged for facilitation penetration of blades:"



36.     For years, the OriginalLine "closed system" was preserved through aggressive

enforcement of patents.  As the *New York Times* reported in August 2010, there were a number

of legal disputes "over the worldwide monopoly Nespresso ha[d] long held on the lucrative

espresso pods that fit its coffee-making machines."[4]

## II.     The Expiration of Patents Permits Competitors Such As Peet's to Sell Capsules Compatible with Counterclaim-Defendants' Espresso Machines

37.     In or around 2012-2013, Counterclaim-Defendants and/or their affiliates lost

important patent disputes and settled others, ultimately resulting in the expiration of the patents

that had kept the OriginalLine a "closed system."

---

[4]    Liz Alderman, *Nespresso and Rivals Vie for Dominance in Coffee War*, N.Y. Times (Aug. 20, 2010), https://www.nytimes.com/2010/08/21/business/global/21coffee.html.

38.     As a result, other coffee companies were newly able to lawfully make, market, and sell single-serve espresso capsules compatible with the OriginalLine, offering consumers greater freedom to purchase espresso capsules of different varieties, qualities, and prices.

39.     One company that subsequently entered into the market for single-serve espresso capsules—and a company about which Counterclaim-Defendants were particularly concerned as a successful competitor—was Peet's.

40.     Peet's is a U.S. specialty coffee company founded by Alfred Peet in 1966 in Berkeley, California.  For over fifty years, Peet's development and sale of premium coffee products has created a legacy that has strongly influenced the artisan coffee movement, inspired coffee entrepreneurs, and accrued a strong reputation and tremendous goodwill among coffee drinkers across the United States.

41.     In addition to being sold at its own coffee shops and licensed partner locations, "Peet's"-branded products are available at grocery stores and other locations across the country, as well as online via Peet's own website and e-retailers such as Amazon.

42.     As a result, Peet's products have developed a loyal following among U.S. consumers and are widely recognized among U.S. coffee drinkers.

43.     In July 2018, Peet's launched its own "Peet's"-branded capsules compatible with OriginalLine machines, offering four flavors with varying levels of intensity denoted by intensity numbers ranging from 8 to 11: *Ricchezza*, *Crema Scura*, *Ristretto*, and *Nerissimo* (with a decaffeinated *Ristretto* subsequently added to the lineup):



44.     Containing premium coffee, and (like Counterclaim-Defendants' capsules) made of aluminum to best ensure freshness and protect the coffee from oxygen, light, and humidity, Peet's capsules are differentiated from plastic capsules that provide a different consumer experience and typically are cheaper.

45.     The consumer response to Peet's espresso capsules has been overwhelmingly positive, as customers have appreciated having another option for a premium at-home espresso experience when using OriginalLine machines, as well as new varieties of espresso not offered by Counterclaim-Defendants.

**III.     Counterclaim-Defendants Devote Tremendous Resources to Identifying the Many Reasons Why Compatible Capsules—Including Peet's Capsules—Are Successful, None of Which Is Related to Consumer Confusion or Alleged Infringement**

46.     Despite their still-dominant position, Counterclaim-Defendants and NNSA were deeply distressed by the loss of the patents and the new reality of a competitive capsule market.

47.     As one retrospective article described the situation following the losses in patent litigations and the loss of the captive audience for OriginalLine: "Talk to senior executives [at Nespresso] involved at the time, and it's clear the rulings were traumatic for the company."[5]

48.     The perceived threat to the single-serve capsule business was viewed as particularly untenable to Counterclaim-Defendants by no later than 2017-2018, when other premium coffee companies like Peet's began launching competitive capsules, including capsules made of aluminum—a significant deviation from the cheaper, lower quality plastic capsules that were on the market and had posed less of a threat to Counterclaim-Defendants.

49.     Internal documents already produced by NUSA in this litigation reflect the companies' perception of the rise of compatibles as a near-existential crisis.

50.     For example, an ████████████████████ presentation stated, echoing a message repeated across numerous other presentations and communications from this time period: "████████████████████████████████████████ ████████████████████████████████ "

51.     Counterclaim-Defendants and NNSA were particularly concerned about Peet's as a potential major player in the capsule market not only because Peet's was offering a premium capsule, but also because of Peet's prior successes, quality products, consumer recognition, and strong reputation.

52.     For example, ████████████████████████████ ██████████████████████████████████████ ██████████

---

[5]   Ed Cumming, *How Nespresso's Coffee Revolution Got Ground Down*, The Guardian (July 14, 2020), https://www.theguardian.com/food/2020/jul/14/nespresso-coffee-capsule-pods-branding-clooney-nestle-recycling-environment.



53.     Faced with the reality that they no longer could be immunized from lawful competition, Counterclaim-Defendants and NNSA sought to identify the reasons for the success of Peet's (and other compatible) capsules.

54.     On information and belief, ██████████████████████████████████████ ██████████████████████████████████ expanded significantly in 2018 and 2019 after premium capsule companies such as Peet's entered the market to compete against Counterclaim-Defendants' own capsules.

55.     ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████

56.     Counterclaim-Defendants and NNSA understood that there were a host of reasons why other companies such as Peet's were making in-roads, including not only those other companies' successes and attractive offerings, but also Counterclaim-Defendants' own deficiencies.

57.     For example, ████████████████████████████████ the relative success of compatible capsules was a natural and expected consequence of the following:



- ██████████████████████████████████████████
████████████████████████████████████████████

- ████████████████████████████████████████████



- █████████████████████████████████████████████████████
- ██████████████████████████████████████████
- ███████████████████████████████████████████████████
- ████████████████████████████████████
- █████████████████████████████████████████
- ███████████████████████████████████████████████
- █████████████████████████████████████████████
- █████████████████████████████
- ██████████████████████████████████████
- ██████████████████████████████████ and
- ██████████████████

58.     Notably missing is any indication whatsoever that Peet's success or diminishment of Counterclaim-Defendants' share is attributable to consumer confusion about whether Peet's is approved, authorized, or associated with Counterclaim-Defendants.  Nor were Counterclaim-Defendants concerned that Peet's was intending to create, or actually creating, such confusion or otherwise engaging in any form of unlawful or unfair conduct.

59.     Moreover, it is unclear why Counterclaim-Defendants now think that alleged confusion would be beneficial to Peet's when Peet's already has its own valuable brand that it seeks to leverage as an *alternative* to buying Counterclaim-Defendants' capsules.

## IV.     Counterclaim-Defendants Devise and Execute Plans to Suppress Competition and " █████████████ " From Competitors, Focusing Particularly on Peet's

60.     Recognizing that they could not put the genie entirely back in the bottle after the OriginalLine system was opened up to competitors, Counterclaim-Defendants and NNSA turned to other strategies to attempt to preserve their dominant position in the marketplace.

61.     For example, the "Vertuo" espresso system was launched as an alternative to OriginalLine, utilizing different technology that could be wholly monopolized based on newer and still-enforceable patents.

62.     But Counterclaim-Defendants and NNSA did not lose their focus on the OriginalLine, considering the issue to be an emergency, and redoubling efforts to stifle compatible capsules.  For example, ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████ to ensure maximum pressure on competitors and retailers alike.

63.     On information and belief, Counterclaim-Defendants and NNSA—along with their marketing and research partners—resolved to pursue a highly-aggressive, multi-pronged

strategy to attempt to capture market share back from competitors, focusing in particular on Peet's and its capsules compatible with OriginalLine machines.

64.    In that regard, marketing presentations and communications repeatedly referred to



65.    Paradigmatic of this anti-competitive approach is a ███████████████ ████████████████████████████████████████████. Among the proposals ██ ████████████████████ is a call to " ████████████████████████████ " including explicitly ████████ .

66.    These efforts were overseen by executives at the highest levels of the corporate hierarchy.  Deeply involved, for example, was Guillaume Le Cunff, the President and CEO of NUSA from 2015-2019 who, per his current LinkedIn profile, was Chief Marketing Officer of NNSA for several years prior to his position at NUSA.

67.    On information and belief, Mr. Le Cunff regularly weighed in on efforts and strategies to combat compatible capsules both during his tenure as President and CEO of NUSA and since 2020 when, on information and belief, he served as CEO of NNSA.

68.    In light of this conduct, the self-serving allegation in the First Amended Complaint that Counterclaim-Defendants "welcome" compatible capsules that are competitive with Counterclaim-Defendants' own capsules is not credible.  (ECF No. 64 at ¶ 6.)

69.    Indeed, Counterclaim-Defendants sought to purloin market share from competitors such as Peet's in several ways, all while ████████████████████████ to try to ensure that Peet's could not attain a greater foothold in the market.

70.     One tactic was to use their dominant position to impose restrictions on the marketing, advertising, display, and offering for sale of third-party compatible capsules at retail locations that sold Counterclaim-Defendants' machines.

71.     For example, as Counterclaim-Defendants acknowledge in the First Amended Complaint (albeit couched in a pretext of concern about "unfair competition"), they took steps to prevent Peet's capsules from being sold in the vicinity of "Nespresso"-branded machines at Target retail locations.  (ECF No. 64 at ¶¶ 72-73.)

72.     In addition to sending a cease-and-desist letter to Peet's, Counterclaim-Defendants reached out directly to Target to exert pressure to keep competitor capsules away from machine displays.

73.     Similarly, in a recently settled lawsuit between NUSA and Williams-Sonoma, Inc. ("Williams Sonoma"), Williams Sonoma noted NUSA's imposition of new Terms and Conditions and a purported "Brand Integrity" clause specifically providing that no other coffee capsules could be "positioned on or in the immediate vicinity of a display of" "Nespresso" machines, and subsequently requiring that compatible capsules "must be at least 20 feet away" from those machines.  If retailers did not comply with these new demands, Counterclaim-Defendants threatened forfeiting promotional support for sales of "Nespresso" machines. *See Nespresso USA, Inc. v. Williams-Sonoma, Inc.*, 1:19-cv-04223 (S.D.N.Y.) (hereinafter, the "*Williams Sonoma Litigation*"), ECF No. 32 at 102-106 (Counterclaims ¶¶ 46-62); ECF Nos. 32-1, 32-2, 32-3 (Counterclaim Exs. 1-3).)

74.     On information and belief, Counterclaim-Defendants sent similar communications and provided similar directives to other retailers of espresso machines and third-party compatible capsules.

75.     On information and belief, at the same time Counterclaim-Defendants were pushing compatible capsules away from their machines at retail locations, they were considering permitting, and/or actually did permit, their "Starbucks" capsules (discussed *infra*) to be placed in the vicinity of espresso machines, and pressured retailers to provide optimal shelf space and display locations for the "Starbucks" capsules over those of competitors such as Peet's.

76.     Counterclaim-Defendants also went to great lengths to make it more difficult for compatible capsules to succeed in e-commerce.  For example, as part of a strategy of

"█████████████████" Counterclaim-Defendants █████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

77.     It is in this context that Counterclaim-Defendants explicitly referred to a perceived need to "█████████████████████████████."

## A.     Counterclaim-Defendants Partner With Starbucks to Recapture Shelf Space

78.     Another critical component of Counterclaim-Defendants' attack on compatible capsules was a partnership with Starbucks to launch a line of OriginalLine-compatible capsules under "Starbucks" branding.

79.     Counterclaim-Defendants sought to blunt the growing share of premium third-party compatible capsules (particularly Peet's) and take back shelf space by launching the "Starbucks by Nespresso" line sold at retail, except for at "Nespresso" boutiques (the "Starbucks Products").

80.     The Starbucks Products utilize the exact same aluminum capsule that are used in Counterclaim-Defendants' own capsules, and thus like Peet's capsules present a premium product with the functional benefits and advantages that aluminum affords.

81.     Because the OriginalLine capsules were designed specifically for optimal use in Counterclaim-Defendants' machines, the Starbucks Products are designed to operate optimally in Counterclaim-Defendants' machines.

82.     The packaging for Starbucks Products prominently features "Starbucks" branding, including the brand's well-recognized logo and name, with the "Nespresso" name appearing in smaller, less noticeable font near the bottom of the packaging:



83.     On information and belief, Counterclaim-Defendants intended that the references to the "Nespresso" brand would be understated and subordinate to the Starbucks branding in

order to maintain an illusion of exclusivity for "Nespresso"-branded capsules (which still would

not be sold at most retail locations in order to maintain the premium image and exclusivity of the

boutique experience).

84.     On information and belief, for the same reasons, the Starbucks Products are sold

through "Starbucks"-branded channels, such as the Starbucks website, but not on Counterclaim-

Defendants' own websites.

85.     Consumers encountering and/or purchasing the Starbucks Products thus are likely

to focus on the Starbucks branding, and are not going to be influenced by the reference to

"Nespresso," let alone draw a connection that "Nespresso" has sourced those products.

86.     Even if consumers did draw that connection, the inclusion of the "Nespresso"

name on the Starbucks Products does not add any particular value to those products or impact

brand perception. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████.

87.     In short, the Starbucks Products are understood by the public as *Starbucks*

capsules.  The domination of the "Starbucks" branding and availability of the capsules through

Starbucks-branded channels but not Counterclaim-Defendants' channels create a clear and

predominant association between those capsules and Starbucks, not Counterclaim-Defendants.

88.     On information and belief, both Counterclaim-Defendants and Starbucks

explicitly recognize that the "Starbucks" branding is of greater value than that of Counterclaim-

Defendants, including through terms in the agreements creating the partnership and license with Starbucks requiring payment to Starbucks for the right to use their branding in connection with the Starbucks Products—and, as Counterclaim-Defendants have represented to this Court, did not include any license to Starbucks of "Nespresso" trademarks or "trade dress" (or payment by Starbucks for such rights) even though the Starbucks Products are sold only through Starbucks' website and retail channels.

89.    Counterclaim-Defendants and Starbucks also have coordinated closely on ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████.

90.   On information and belief, Counterclaim-Defendants and Starbucks coordinate through a group called "Nestlé Coffee Partners," which includes former Starbucks personnel and was borne of the partnership between the companies that Nestlé secured in or around 2018 for a payment of over $7 billion.

**B.   Counterclaim-Defendants Seek to Perpetually Extend Their Monopoly Despite Expiration of Their Patents By Asserting Meritless and Inconsistent "Trade Dress" and Product Design Theories Under Trademark Laws**

91.   Counterclaim-Defendants' efforts to bully competitors selling compatible capsules goes beyond aggressive practices in the course of business, and has extended to legal maneuvering.

92.   Faced with the expiration of their patents, Counterclaim-Defendants pivoted to a worldwide strategy of asserting that the previously patented capsule shape was also protectable as "trade dress" or as three-dimensional trademarks that theoretically would never lapse.

93.     In its most recent iteration—that is, in the current lawsuit—Counterclaim-Defendants describe the capsule trade dress as "[t]he overall commercial impression created by the unique combination" of "four distinct elements:" "(a) A frustoconical top portion (a cone with its top removed), transitioning abruptly to a more vertical side wall that connects to the flange of the capsule; (b) An opaque color; (c) A circular bottom that is wider in diameter than the top of the capsule; and (d) An inverted frustoconical indentation at the top." (ECF No. 64 at ¶¶ 20-21.) That configuration is referred to hereinafter as the "Alleged Trade Dress."

94.     Counterclaim-Defendants' efforts to articulate trade dress protections extend back over twenty years, and include two attempts to secure federal trademark registrations, as well as a series of lawsuits and other enforcement activities intended to chill competition.

### 1.    *SPN's Initial Failed Attempt To Secure A Trade Dress Registration*

95.     In 2002, SPN applied for a federal registration at the U.S. Patent & Trademark Office ("USPTO") for the capsule shape, *see* U.S. Trademark Application Serial No. 78/119,651 (the "'651 Application"):



96.     After an initial refusal by the Trademark Examiner on grounds of both functionality and lack of distinctiveness, SPN contended in a submission on February 28, 2003, that the capsule shape was "inherently distinctive" and further represented—despite the existence of the patents discussed *supra* at ¶¶ 32-36—that the "mark is not the subject of any patents."

97.     A few months later, the USPTO once again denied registration on both functionality and non-distinctiveness grounds.

98.     In addition to citing to evidence located online indicating that the capsule was "custom designed" and "specially designed to be opened, used, crushed, and then ejected from . . . applicant's espresso machines," the Trademark Examiner noted the existence of three patents, including the '202 Patent discussed *supra* at ¶ 34.

99.     Rather than answer the Examiner's questions concerning functionality and non-distinctiveness, SPN abandoned the application.

### 2.     *SPN's Current Attempt To Secure Registration For* <u>*Different*</u> *Trade Dress*

100.     In December 2018, after NUSA sent an initial threat letter to Peet's, SPN again sought to register trade dress in the capsule design with the USPTO via U.S. Trademark Application Serial No. 88/215,860 (the "'860 Application").

101.     The First Amended Complaint contends that the same Alleged Trade Dress that Counterclaim-Defendants have asserted in this case against Peet's "is the subject of . . . the '860 Application." (ECF No. 64 at ¶ 24.)

102.     Similarly, in an April 26, 2022 submission to the USPTO in connection with Peet's pending Opposition to the '860 Application (which is currently suspended at SPN's request on account of this lawsuit), SPN contended that the Alleged Trade Dress asserted in this case and the trade dress in the '860 Application are "identical."

103.     The subject of the '860 Application, however, is different from the Alleged Trade Dress in at least two respects:  (1) the '860 Application confirms that "[c]olor is not claimed as a feature of the mark" (whereas "opaque color" is a component of the Alleged Trade Dress); and

(2) the '860 Application expressly disclaims any attempt to obtain protection of the portion of the capsule image below shown in broken or dotted lines:



104. After being compelled by the Court to provide a clear and unequivocal response to a Request for Admission served by Peet's in this case, NUSA admitted that the Alleged Trade Dress encompasses features that are shown in the broken or dotted lines (and thus *not* part of the trade dress sought to be registered in the '860 Application).

105. Accordingly, the '860 Application only covers the top portion of the capsule, and deviates substantially from the "commercial impression created by the unique combination" of "four distinct elements" comprising the Alleged Trade Dress.

106. In all events, just like it did over a decade earlier, SPN again (mis)informed the USPTO that the capsule was not the subject of any patents, stating in a July 2019 response to questions from the Trademark Examiner: "The features of the Mark for which trade dress protection is sought is not and have not been the subject of a design or utility patent."

107. SPN made no mention of its prior effort to secure protection in the capsule design via the '651 Application, the denial and abandonment of that application, or the patents cited by the USPTO in connection with the denial of that application.

108.    Following additional proceedings, the Trademark Examiner published the '860

Application, and Oppositions were filed by Williams Sonoma and Peet's, among other parties.

109.    SPN twice succeeded in moving to suspend the opposition proceedings, once after

filing the *Williams Sonoma Litigation* and again after filing the current lawsuit.

110.    After settlement of the *Williams Sonoma Litigation*, the USPTO inadvertently

issued a registration for the capsule on August 3, 2021, overlooking the still-pending Peet's

Opposition proceeding.

111.    Counterclaim-Defendants, however, never mentioned the registration to Peet's,

and on information and belief did not inform the USPTO of the error.

112.    It was only when Peet's noticed the erroneous registration and notified the

USPTO over a month later that the USPTO cancelled the registration.

113.    On information and belief, Counterclaim-Defendants were aware of the erroneous

registration but chose not to inform the USPTO or any third parties of the mistake.

### 3.    *NUSA's Various Enforcement Attempts Articulating <u>Different</u> Trade Dress*

114.    Notwithstanding the lack of any registration, Counterclaim-Defendants claim to

have "vigorously enforce[d]" the Alleged Trade Dress.  (ECF No. 64 at ¶ 53.)

115.    For example, the First Amended Complaint states that "in just the past four

years," NUSA "has sent over thirty cease-and-desist letters to third parties" asserting trade dress

and/or trademark infringement.  (*Id.* at ¶ 54.)

116.    Although the pleading does not clarify how many of those letters specifically

alleged capsule trade dress violations, the enforcement activities of which Peet's already is aware

demonstrate wide variations in how the purported trade dress have been articulated.

117.    The following table illustrates just some of the ways—in addition to the different articulations represented to the USPTO—in which Counterclaim-Defendants have described capsule trade dress and ways in which it supposedly was infringed:

| Date | Document | Definition/Description of Capsule Trade Dress |
|---|---|---|
| 5/6/14 | Complaint in *Nespresso USA, Inc. v. HiLine Coffee Co., Inc.*, No. 1:14-cv-03292 (S.D.N.Y. May 6, 2014) (ECF No. 2) | • "[D]istinctive shape, design and color scheme of the Nespresso® cone-shaped capsules;"<br>• Alleges infringement of capsules' "silver top." |
| 7/16/15 | Complaint in *Nespresso USA, Inc. v. Africa America Coffee Trading Co. LLC*, No. 1:15-cv-05553 (S.D.N.Y. July 16, 2015) (ECF No. 1) | • "[S]hape, design and color scheme;"<br>• Alleges infringement by capsules "using a similar color scheme" and "'cone' shape." |
| 10/19/18 | "[D]emand letter" to Peet's referenced in First Amended Complaint ¶ 73 (ECF No. 64-4) | Alleges infringement of capsules where:<br>- "the top . . . ha[s] an identical 'cone' shape, including the circular dimple in the middle of the cone;"<br>- "the bottom" has the "same circular shape" and "same size in diameter;" and<br>- capsules have "same height and width," and "are opaque and come in similar colors." |
| 5/9/19 | Original Complaint in the *Williams Sonoma Litigation* (ECF No. 1) | "(i) an opaque color;<br> (ii) a conical top that has a dimple;<br> (iii) sides that slope slightly downward from the conical top at an angle;<br>(iv) such sides then sloping downward at a straight, 180-degree angle until they meet and merge into the bottom of the Capsule; and<br>(v) a circular bottom that is wider in diameter than the conical top of the Capsule." |
| 12/23/19 | Amended Complaint in the *Williams Sonoma Litigation* (filed at ECF No. 22) | "[T]he trade dress . . . consists of <u>three</u> distinct elements[:]"<br>    (1) "an opaque color;"<br>    (2) "a frustoconical shape, with sides that slope slightly downward from the top, and then slope immediately downward at a straight, 180-agree [sic] angle until they meet and merge into the bottom of the Capsule;"<br>    (3) "a circular bottom that is wider in diameter than the top of the Capsule." |

118.     On information and belief, other enforcement efforts and communications regarding compatible capsules delineate additional descriptions of the Alleged Trade Dress.

119.     On information and belief, Counterclaim-Defendants are aware that they lack enforceable trade dress rights, but recognize that shifting trade dress descriptions are convenient for threatening competitors who make and sell compatible capsules.

120.     In that regard, Counterclaim-Defendants have conspicuously equivocated when pressed in this litigation to articulate any stable concept of the Alleged Trade Dress.

121.     For example, when served with a Request for Admission that—in direct contrast to NUSA's allegations in the *Williams Sonoma Litigation*—OriginalLine capsules "do not include sides that slope immediately downward at a straight, 180-degree angle until they meet and merge into the bottom of such capsules," NUSA first refused to answer on grounds that the request "calls for information that will be the subject of expert discovery and testimony." When compelled by the Court to answer, NUSA denied the request only because "depending on the plane of reference, [OriginalLine capsules] can be considered to have sides that slope immediately downward at a straight, 180-degree angle until they meet and merge into the bottom of such capsules."

122.     As far as Peet's is aware, Counterclaim-Defendants have never before suggested that the purported trade dress subsisting in OriginalLine capsules varies "depending on the plane of reference" and/or what the capsules merely "can be considered to have."

123.     Similarly, when compelled by the Court to provide responses to other Requests for Admission about whether certain other third-party compatible capsules that Counterclaim-Defendants concede are not infringing "contain the ALLEGED TRADE DRESS," NUSA "admitted" only that such capsules "do[ ] not contain the ALLEGED TRADE DRESS in its

entirety"—a statement that makes no sense given that such trade dress was defined in this case as a "commercial impression created by the unique combination" of various elements.

124. Indeed, NUSA's equivocal responses that impermissibly seek to preserve every possible permutation of capsule design elements as potential "trade dress" *directly contradict* the very argument that NUSA made in opposition to Peet's Motion to Dismiss in this case:

> Initially, [Peet's] Motion mischaracterizes the Original NESPRESSO Capsule Trade Dress as a "combination of elements" whereas, in fact, the NESPRESSO Capsule Trade Dress is the "*overall commercial impression* created by the unique combination of the four distinct elements[.]"   (Compl. ¶ 19 (emphasis added)). Defendant's improper attempt to re-define the Original NESPRESSO Capsule Trade Dress provides an independent reason for the Court to deny the Motion. *Cartier, Inc. v. Sardell Jewelry, Inc.*, 294 F. App'x 615, 621-22 (2d Cir. 2008) (McMahon, J., empaneled by designation) ("[I]t was improper for defendants to break the trade dress down into specific elements . . . because plaintiff's claim is that the combination and arrangement of those design elements comprise the trade dress[.]").

(*See* ECF No. 34 at 9.)

## V. Counterclaim-Defendants' Efforts To Secure Trade Dress Or Analogous Protection In The Capsule Shape Are Consistently Rejected, <u>Including Most Recently In Nestlé's Home Country of Switzerland</u>

125. At or around the same time that SPN first sought a U.S. federal registration for the capsule shape via the '651 Application, SPN and/or its affiliates began seeking similar non-patent intellectual property protections for the capsule shape in other jurisdictions around the world.

126. On information and belief, attempts to obtain design protections for OriginalLine capsules were rejected in countries including the United Kingdom, China, Sweden, Portugal, Norway, Spain, Croatia, South Korea, Vietnam, Iran, Japan, Singapore, Mexico, and Brazil.

127.     In 2002, the European Union Intellectual Property Office refused to register the capsule shape, although SPN and/or its affiliates were successful in persuading a subset of individual European jurisdictions to register that shape.

128.     Over the past several years, Counterclaim-Defendants and their affiliates have suffered a series of defeats across a variety of jurisdictions, with courts recognizing that the same exact capsule shape at issue in the current litigation is not susceptible to design protections due to concerns about both non-distinctiveness and the utilitarian functions or benefits of that shape.

129.     In 2014, the German Patent and Trade Mark Office canceled design protection for the capsule shape as part of an *inter partes* proceeding that concerned many of the same issues present in the current litigation.

130.     Among other statements regarding the capsule shape, the 2014 decision noted that: (i) "the trade mark department has no doubt that the patent documents are relevant for the assessment of the functionality of the contested trade mark;" (ii) the flange, the shape of the "double cone," and the "curvature of the cover" of the capsule served technical functions; and (iii) "[e]ven when looking closely at the capsule . . . the indentation is hardly recognizable in some cases" and "[f]rom certain perspectives" the indentation is not visible at all."[6]

131.     Three years later, the German Federal Patent Court upheld the invalidation by the German Patent and Trademark Office.

132.     In 2016, in a proceeding impacting trademark protections in Belgium, the Netherlands, and Luxembourg, the Commercial Court of Brussels also confirmed that the registration of the capsule shape must be invalidated.

---

[6]   Quotations from foreign decisions are translated into English for purposes of this pleading.

133.    The Brussels Court specifically referred to and depicted certain patents, including the Swiss analogue to the '202 Patent, rejecting Nestlé's argument that the patent relates only to the interaction of a capsule with a coffee machine rather than a capsule itself, and concluding that the double truncated cone shape is functional.

134.    The Brussels Court further explained that the indentation in the capsule eliminates certain disadvantages such as the capsule being easily crushed, and thus the indentation "solves a technical problem by a technical function."

135.    Notably, the Brussels Court referred to an exhibit in Nestlé's submissions (to which Peet's does not have access but will seek in discovery, along with other materials submitted by Nestlé entities reflecting factual statements and opinions concerning capsule functionality) including an Internet article indicating that the OriginalLine capsule has the best properties and that competing capsules have disadvantages with respect to water leakage and blocking the flow of coffee.

136.    In September 2021, the Swiss Federal Tribunal confirmed a lower court decision invalidating the three-dimensional mark protection in Nestlé's home country.

137.    The Swiss authority, too, evaluated the foreign analogue of the '202 Patent, and otherwise concluded that the shape of "Nespresso" capsules were specifically designed to match the capsule compartment in "Nespresso" machines and thus dictated by necessity, including specifically the "double frustoconical and conical shape" with specific conicity angles.

138.    The Swiss court discussed expert opinions offered by both Nestlé and its adversary concerning functionality of the capsules (again, which Peet's intends to seek in discovery), as well as analyses of five hypothetical alternative capsules that Nestlé presented but that were determined through testing to have functional disadvantages.

139.     On information and belief, in the above-referenced foreign proceedings as well as other proceedings that addressed the functionality of the "Nespresso" capsule and elements thereof, Counterclaim-Defendants and/or their affiliates have made or endorsed factual statements about capsule design and operation that do not comport with Counterclaim-Defendants' current and anticipated arguments that the Alleged Trade Dress is non-functional.

## VI.   Undeterred By Rejections Of Their Trade Dress Theories, Counterclaim-Defendants Assert Purported Trade Dress and Trademark Concerns to Peet's In 2018, But Tellingly Wait Over Three Years To File Suit

140.     On October 19, 2018, NUSA sent a cease-and-desist letter to Peet's accusing Peet's of willful trademark and trade dress infringement (and dilution) based on the sale of Peet's capsules compatible with OriginalLine machines.  (*See* ECF No. 64-4.)

141.     The October 2018 letter did not describe the purported trade dress in the capsule design in the same manner as the Alleged Trade Dress articulated in this litigation; for example, the letter did not mention a "frustoconical indentation," and contended that the Peet's capsules have the "same height and width as the Nespresso capsules."

142.     With respect to alleged trademark concerns, NUSA contended, *inter alia*, that Peet's was not using the word "Nespresso" properly in Peet's compatibility statements, and that Peet's non-affiliation disclaimers were not sufficiently "prominent" or "proximate."

143.     NUSA also complained that Peet's capsules were being displayed in Target retail stores "alongside and/or in close proximity to Nespresso's machines and product displays," depicting the same image of a Target display that appears in Counterclaim-Defendants' pleading.

144.     In the October 2018 letter, NUSA demanded that Peet's immediately and permanently cease a panoply of activities including to "forever refrain from displaying . . . Peet's

Capsules alongside and/or in connection with and/or in close proximity to Nespresso's product displays in retail locations," and to "destroy all Peet's Capsules and related packaging."

145.    The October 2018 letter did not identify any instances of consumer confusion arising from the marketing or sale of Peet's capsules compatible with the OriginalLine machine.

146.    Peet's responded to NUSA on November 8, 2018, explaining that Peet's disagreed with NUSA's positions, including describing how Peet's use of the "Nespresso" name was protected as nominative fair use and noting how the purported trade dress in OriginalLine capsules was functional and not distinctive.  (*See* **Exhibit 1**.)

147.    For example, Peet's explained in the November 2018 letter that:

[A]lmost all of the "similarities" between the capsules you highlight are necessary for the capsules to properly function in Nespresso machines.  For example, the general conical shape, the circular bottom, the dimple at the top, and the size are all features that are required in order for the capsules and machine to function correctly together.  If the Peet's Capsules were larger, they would not fit correctly in the machine, and they would not function properly with the machines' ejection and disposal mechanisms; if the Capsules were smaller, they would contain less coffee (and accordingly could not produce the correct amount and/or flavor), and they would lead to water leakage, wasting water and potentially damaging the machine.  Similarly, the conical design of the Capsule is necessary to achieve reliable feeding into position as the brew chamber closes, ensure correct ejection, and allow for reliable sealing of the Capsule.  The shape also allows the Capsules to resist creasing, denting, and crushing in the piercing and brewing process. . . .  Further, the "dimple" on the top of the Peet's Capsules allows the perforation of the Capsule in optimal conditions by reinforcing its stability and its resistance to deformation by offering a fulcrum to the perforation device.

148.    Peet's also explained that it understood that Target stores were no longer featuring Peet's capsules in the appliance section of its stores, and that the image from a Target store included in NUSA's letter "either evidences a prior store configuration, which is no longer an issue, or is a configuration which has not been approved or endorsed by Peet's."

149.    In subsequent correspondence on November 28, 2018, and December 21, 2018, NUSA and Peet's continued to disagree regarding the merits of NUSA's accusations.

150.    At no point in 2018 (or thereafter) did Peet's suggest that it would modify the shape of its capsules.

151.    The December 21, 2018 letter from Peet's is the last time that the parties communicated about any dispute relating to Peet's uses of "Nespresso" in connection with marketing or packaging, or placement of Peet's capsules at retail locations, prior to the filing of the original Complaint in this litigation over three years later in March 2022.

152.    On information and belief, Counterclaim-Defendants have not identified any instance of Peet's capsules appearing next to espresso machines at retail locations since 2018.

153.    Notwithstanding Counterclaim-Defendants' allegations in the First Amended Complaint regarding "tireless" and "feverish" efforts to resolve the parties' dispute, there were long gaps of time—often spanning months—in which Counterclaim-Defendants did not contact Peet's, and during which time Peet's continued to market and sell compatible capsules without incident.

154.    For example, over five months passed between Peet's sending a letter to NUSA concerning the capsule shape in February 2019 and NUSA's outreach via a phone call in July 2019.

155.    In September 2020, Peet's filed an Opposition to the '860 Application in the Trademark Trial and Appeal Board ("TTAB").

156.    In October 2020, SPN moved to suspend the Opposition proceedings in favor of the *Williams Sonoma Litigation*, and the TTAB granted the suspension (over Peet's objections) in February 2021.

157.    SPN ultimately filed its Answer to the Opposition proceedings on December 17, 2021, and Peet's subsequently served discovery requests on SPN on February 2, 2022.

158.     SPN requested, and Peet's agreed in good faith to, an extension of deadlines in the Opposition proceeding.  Accordingly, a stipulation was submitted to the Trademark Trial and Appeal Board on March 4, 2022, and an extension was granted on March 15, 2022.

159.     Unbeknownst to Peet's, at the same time SPN had requested the extension, NUSA—represented by the same counsel as SPN—was preparing to file the Complaint in this litigation.

160.     NUSA subsequently filed the Complaint on March 17, 2022.

161.     The following day, SPN sought suspension of the Opposition proceeding and, once again over Peet's objections, that suspension was granted.

162.     At no point over the course of the above proceedings, or at any point following receipt of the initial cease-and-desist letter from NUSA in 2018, has Peet's discontinued any sales of its compatible capsules.

163.     At no point have Counterclaim-Defendants identified any actual consumer confusion arising from the marketing or sale of Peet's compatible capsules.

164.     The only "actual" confusion alleged by Counterclaim-Defendants in the nearly five years since the launch of Peet's capsules are the online customer reviews and comments set forth in Paragraphs 79 through 86 of the First Amended Complaint, which—as detailed in Peet's Answer to those Paragraphs (*see supra*), are inadmissible hearsay, and in all events do not demonstrate confusion but rather that consumers use the term "Nespresso" to refer generally to all single-serve espresso capsules.

**VII.    Notwithstanding Alleged Concerns About Confusion, Counterclaim-Defendants Allow Williams Sonoma To Sell Allegedly Infringing Capsules For A Long Period Of Time, And Then Agree To A Revised Capsule Shape That Is Barely Changed**

165.    In its pleading in the *Williams Sonoma Litigation*, NUSA accused Williams Sonoma of marketing and selling "nearly identical" espresso capsules as part of "willful conduct" that "cause (and continues to cause) actual consumer confusion."

166.    Notwithstanding the purported confusion and alleged "irreparable harm" it was causing, NUSA and Williams Sonoma reached a confidential settlement that, on information and belief, permitted Williams Sonoma to keep selling the allegedly infringing capsules for many months—if not years—following the dismissal of the litigation in July 2021.

167.    Even as of the date of these Counterclaims, Williams Sonoma is marketing on its website certain compatible capsules using images of the allegedly infringing capsules, without complaint from Counterclaim-Plaintiffs:



Williams Sonoma Coffee Capsules Irish Cream
**Sugg. Price $8.95**
**Clearance   $3.99**

See More Like This



Williams Sonoma Coffee Capsules, Spiced Pecan Pumpkin
**Sugg. Price $8.95**
**Clearance   $3.99**

See More Like This

168.    In addition, following the settlement (the terms of which are confidential and Peet's has not yet received in discovery), Williams Sonoma modified its capsule shape.

169.    On information and belief, the modification of the capsule shape was expressly permitted by the settlement, such that NUSA agreed on behalf of itself and its affiliates that no trade dress infringement lawsuit would be brought against Williams Sonoma in connection with the revised capsules.

170.    Changes to the revised capsules, however, are minimal, and on information and belief consumers do not even notice the minor modification that appears to have been made to the top cone portion of the capsule (depicted in the below images taken from Williams Sonoma's website):

   



171.    On information and belief, Counterclaim-Defendants have not conducted or reviewed any analysis demonstrating that consumers perceive the revised Williams Sonoma capsule in a materially different way from how they perceived the prior iteration of that capsule, or in a materially different way from how consumers perceive OriginalLine capsules.

### CLAIMS FOR RELIEF

### COUNT I
*(Declaratory Judgment That Counterclaim-Defendants
Possess No Trade Dress Rights In The Capsule Design)*

172.    Peet's incorporates by reference the allegations in the preceding paragraphs of the Counterclaims.

173.    There is an actual controversy between Peet's and Counterclaim-Defendants concerning the validity of the Alleged Trade Dress that is ripe for adjudication by the Court, including because Counterclaim-Defendants have sought to enforce such Alleged Trade Dress against Peet's in this litigation.

174.    The Alleged Trade Dress is functional.

175.    The Alleged Trade Dress is not distinctive, and does not have secondary meaning among relevant U.S. consumers.

176.    The Alleged Trade Dress is generic, as U.S. consumers have been exposed to myriad other compatible capsules creating the same commercial impression.

177.    Counterclaim-Defendants are well aware that they lack any protectable trade dress rights in the OriginalLine capsule, and have sought to enforce the Alleged Trade Dress against Peet's in order to stifle lawful competition from Peet's rather than due to a genuine concern about confusion.

178.    Counterclaim-Defendant SPN misrepresented to the USPTO that the OriginalLine capsule was not subject of any patents or patent applications, with full knowledge that the capsule was subject of a number of patents, and that a prior attempt to secure trade dress registration was rejected based on certain of those patents.

179.    Peet's therefore is entitled to a declaration that Counterclaim-Defendants lack any protectable or enforceable trade dress rights in the design and shape of OriginalLine capsules.

## **COUNT II**
*(Declaratory Judgment That Counterclaim-Defendants*
*Possess No Trademark Rights In "Nespresso" Trademarks)*

180.    Peet's incorporates by reference the allegations in the preceding paragraphs of the Counterclaims.

181.    There is an actual controversy between Peet's and Counterclaim-Defendants concerning the validity of the "Nespresso" word marks that is ripe for adjudication by the Court, including because Counterclaim-Defendants have sought to enforce such marks against Peet's in this litigation.

182.    As demonstrated by the alleged (inadmissible hearsay) instances of consumer confusion put forth by Counterclaim-Defendants in their pleading, relevant U.S. consumers use

and understand the term "Nespresso" generically to refer to the category of single-serve espresso systems, machines, and capsules.

183. The "Nespresso" trademarks being asserted against Peet's in this litigation are generic and invalid, and do not refer to Counterclaim-Defendants as the source of capsules.

184. Counterclaim-Defendants have sought to enforce trademarks against Peet's in order to stifle lawful competition from Peet's rather than due to a genuine concern about consumer confusion.

185. Peet's therefore is entitled to a declaration that Counterclaim-Defendants lack any protectable or enforceable trademark rights in the "Nespresso" trademarks being asserted against Peet's in this litigation.

## **PRAYER FOR RELIEF**

WHEREFORE, Peet's respectfully requests that this Court enter the following relief in favor of Peet's and against Counterclaim-Defendants:

A.     Declaring the Alleged Trade Dress invalid, and that Counterclaim-Defendants lack any protectable or enforceable trade dress rights in the design and shape of OriginalLine capsules or any constituent parts thereof;

B.     Declaring the "Nespresso" trademarks asserted against Peet's in this litigation invalid, and that Counterclaim-Defendants lack any protectable or enforceable trademark rights therein;

C.     Declaring that the '860 Application is null and void;

D.     Awarding Peet's costs and reasonable attorneys' fees incurred in this matter; and

E.     Awarding Peet's such other and further relief as the Court may deem proper.

## **JURY DEMAND**

Peet's requests a trial by jury for all triable issues pursuant to Rule 38 of the Federal

Rules of Civil Procedure.


Date:   February 24, 2023                                    Respectfully submitted,
        New York, New York


                                              /s/ Jordan A. Feirman
                                              Douglas R. Nemec
                                              Douglas.Nemec@skadden.com
                                              Jordan A. Feirman
                                              Jordan.Feirman@skadden.com
                                              David M. Lamb
                                              David.Lamb@skadden.com
                                              Michael C. Salik
                                              Michael.Salik@skadden.com
                                              SKADDEN, ARPS, SLATE,
                                                MEAGHER & FLOM LLP
                                              One Manhattan West
                                              New York, New York 10001
                                              Telephone:  (212) 735-3000

                                              *Attorneys for Defendant/Counterclaim-Plaintiff*
                                              *Peet's Coffee, Inc.*